Affirmed in part, vacated in part by published opinion. Chief Judge Gregory wrote the opinion, in which Judges Motz, King, Wynn, Diaz, Floyd, and Harris joined in full. Judge Traxler wrote an opinion concurring in the judgment. Judge Keenan wrote an opinion concurring in part and concurring in the judgment, in which Judge Thacker joined except as to Part II.A.Í. Judge Wynn wrote a concurring opinion. Judge Thacker wrote a concurring opinion. Judge Niemeyer wrote a dissenting opinion, in which Judges Shedd and Agee joined. Judge Shedd wrote a dissenting opinion, in which *572 Judges Niemeyer and Agee joined. Judge Agee wrote a dissenting opinion, in which Judges Niemeyer and Shedd joined.
GREGORY, Chief Judge [1]
The question for this Court, distilled to its essential form, is whether the Constitution, as the Supreme Court declared in Ex parte Milligan, 71 U.S. (4 Wall.) 2, 120, 18 L.Ed. 281 (1866), remains “a law for rulers and people, equally in war and in peace.” And if so, whether it protects Plaintiffs’ right to challenge an Executive Order that in text speaks with vague words of national security, but in context drips with religious intolerance, animus, and discrimination. Surely the Establishment Clause of the First Amendment yet stands as an untiring sentinel for the protection of one of our most cherished founding principles—that government shall not establish any religious orthodoxy, or favor or disfavor one religion over another. Congress granted the President broad power to deny entry to aliens, but that power is not absolute. It cannot go unchecked when, as here, the President wields it through an executive edict that stands to cause irreparable harm to individuals across this nation. Therefore, for the reasons that follow, we affirm in substantial part the district court’s issuance of a nationwide preliminary injunction as to Section 2(c) of the challenged Executive Order.
I.
A.
In the early evening of January 27, 2017—seven days after taking the oath of office—President Donald J. Trump signed Executive Order 13769, “Protecting the Nation Prom Foreign Terrorist Entry Into the United States” (“EO-1” or “First Executive Order”), 82 Fed. Reg. 8977 (Jan. 27, 2017). Referencing the past and present failings of the visa-issuance process, the First Executive Order had the stated purpose of “protect[ing] the American people from terrorist attacks by foreign nationals.” EO-1, Preamble. To protect Americans, EO-1 explained, the United States must ensure that it does not admit foreign nationals who “bear hostile attitudes” toward our nation and our Constitution, who would “place violent ideologies over American law,” or who “engage in acts of bigotry or hatred” (such as “ ‘honor’ killings”). Id. § 1.
To that end, the President invoked his authority under 8 U.S.C. § 1182(f) and immediately suspended for ninety days the immigrant and nonimmigrant entry of foreign aliens from seven predominantly Muslim countries: Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.[2] See EO-1, § 3(c). During the ninety-day period, the Secretary of Homeland Security, Secretary of State, and Director of National Intelligence were to “immediately conduct a review to determine the information needed from any country” to assess whether individuals seeking entry from those countries posed a national security threat. Those cabinet officers were to deliver a series of reports updating the President as to that review and the implementation of EO-1. See id. § 3(a)-(b), (h).
The First Executive Order also placed several constraints on the admission of *573 refugees into the country. It reduced the number of refugees to be admitted in fiscal year 2017 from 110,000 to 50,000 and barred indefinitely the admission of Syrian refugees. Id. § 5(c)—(d). It further ordered the Secretary of State to suspend for 120 days the United States Refugee Admissions Program (“USRAP”). Id. § 5(a). Upon resumption of USRAP, EO-1 directed the Secretary of State to “prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual’s country of nationality.” Id. § 5(b).
Individuals, organizations, and states across the nation challenged the First Executive Order in federal court. A judge in the Western District of Washington granted a Temporary Restraining Order (“TRO”), enjoining enforcement nationwide of Sections 3(c), 5(a)-(c), and 5(e). See Washington v. Trump, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017). The Ninth Circuit subsequently denied the Government’s request to stay the TRO pending appeal and declined to “rewrite” EO-1 by narrowing the TRO’s scope, noting that the “political branches are far better equipped” for that task. Washington v. Trump, 847 F.3d 1151, 1167 (9th Cir. 2017) (per curiam). At the Ninth Circuit’s invitation, and in an effort to avoid further litigation concerning the First Executive Order, the President enacted a second order (“EO-2” or “Second Executive Order”) on March 6, 2017. Exec. Order No. 13780, “Protecting the Nation from Foreign Terrorist Entry Into the United States,” 82 Fed. Reg. 13209 (Mar. 6, 2017). The Second Executive Order revoked and replaced the First Executive Order. Id. § l(i).
Section 2(c) of EO-2—“Temporary Suspension of Entry for Nationals of Countries of Particular Concern During Review Period”—is at the heart of the dispute in this case. This section reinstated the ninety-day suspension of entry for nationals from six countries, eliminating Iraq from the list, but retaining Iran, Libya, Somalia, Sudan, Syria, and Yemen (the “Designated Countries”). EO-2, § 2(c). The President, again invoking 8 U.S.C. § 1182(f) and also citing 8 U.S.C. § 1185(a), declared that the “unrestricted entry” of nationals from these countries “would be detrimental to the interests of the United States.” Id.[3]
The Second Executive Order, unlike its predecessor, states that nationals from the Designated Countries warrant “additional scrutiny” because “the conditions in these countries present heightened threats.” Id. § 1(d). In justifying the selection of the Designated Countries, EO-2 explains, “Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones.”[4] Id. The *574 Second Executive Order states that “until the assessment of current screening and vetting procedures required by section 2 of this order is completed, the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high.” Id. § 1(f).
The Second Executive Order also provides brief descriptions of the conditions in each of the Designated Countries. It notes, for instance, that “Sudan has been designated as a state sponsor of terrorism since 1993 because of its support for international terrorist groups, including Hizballah and Hamas[, and] ... elements of core al-Qa’ida and ISIS-linked terrorist groups remain active in the country.” Id. § l(e)(iv). The Second Executive Order further states that “[s]inee 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States.” Id. § 1(h). It provides the following examples: two Iraqi refugees who were convicted of terrorism-related offenses in January 2013, and a naturalized citizen who came to this country as a child refugee from Somalia and who was sentenced for terrorism-related offenses in October 2014. Id. The Second Executive Order does not include any examples of individuals from Iran, Libya, Sudan, Syria, or Yemen committing terrorism-related offenses in the United States.
The Second Executive Order clarifies' that the suspension of entry applies to foreign nationals who (1) are outside the United States on its effective date of March 16, 2017, (2) do not have a valid visa on that date, and (3) did not have a valid visa on the effective date of EO-1—January 27, 2017. Id. § 3(a). Section 2(c) does not bar entry of lawful permanent residents, dual citizens traveling under a passport issued by a non-banned country, asy-lees, or refugees already admitted to the United States. Id. § 3(b). The Second Executive Order also includes a provision that permits consular officers, in their discretion, to issue waivers on a case-by-case basis to individuals barred from entering the United States. Id. § 3(c).
The Second Executive Order retains some—but not all—of the First Executive Order’s refugee provisions. It again suspends USRAP for 120 days and decreases the number of refugee admissions for fiscal year 2017 by more than half, id. § 6(a), but it does not include the indefinite ban on Syrian refugees. The Second Executive Order also eliminates the provision contained in EO-1 that mandated preferential treatment of religious minorities seeking refugee status. It explains that this provision “applied to refugees from every nation, including those in which Islam is a minority religion, and it applied to minority sects within a religion.” Id. § l(b)(iv). It further explains that EO-1 was “not moti *575 vated by animus toward any religion,” but rather was designed to protect religious minorities. Id.
Shortly before the President signed E0-2, an unclassified, internal report from the Department of Homeland Security (“DHS”) Office of Intelligence and Analysis dated March 2017 was released to the public. See J.A. 425-31. The report found that most foreign-born, U.S-.-based violent extremists became radicalized many years after entering the United States, and concluded that increased screening and vetting was therefore unlikely to significantly reduce terrorism-related activity in the United States. J.A. 426. According to a news article, a separate DHS report indicated that citizenship in any country is likely an unreliable indicator of whether a particular individual poses a terrorist threat. J.A. 424. In a declaration considered by the district court, ten former national security, foreign policy, and intelligence officials who previously served in the White House, State Department, DHS, and Central Intelligence Agency—four of whom were aware of intelligence related to terrorist threats as of January 20, 2017— advised that “[t]here is no national security purpose for a total ban on entry for aliens from the [Designated Countries].” J.A. 91.
B.
The First and Second Executive Orders were issued against a backdrop of public statements by the President and his advis-ors and representatives at different points in time, both before and after the election and President Trump’s assumption of office. We now recount certain of those statements.
On December 7, 2015, then-candidate Trump published a “Statement on Preventing Muslim Immigration” on his campaign website, which proposed “a total and complete shutdown of Muslims entering the United States until our country’s representatives can figure out what is going on.” J.A. 346.[5] That same day, he highlighted the statement on Twitter, “Just put out a very important policy statement on the extraordinary influx of hatred & dan *576 ger coming into our country. We must be vigilant!” J.A. 470. And Trump read from the statement at a campaign rally in Mount Pleasant, South Carolina, that evening, where he remarked, “I have friends that are Muslims. They are great people— but they know we have a problem.” J.A. 472.
In an interview with CNN on March 9, 2016, Trump professed, “I think Islam hates us,” J.A. 516, and “[W]e can’t allow people coming into the country who have this hatred,” J.A. 517. Katrina Pierson, a Trump spokeswoman, told CNN that “[w]e’ve allowed this propaganda to spread all through the country that [Islam] is a religion of peace.” J.A. 518. In a March 22, 2016 interview with Fox Business television, Trump reiterated his call for a ban on Muslim immigration, claiming that this proposed ban had received “tremendous support” and stating, “we’re having problems with the Muslims, and we’re having problems with Muslims coming into the country.” J.A. 522. “You need surveillance,” Trump explained, and “you have to deal with the mosques whether you like it or not.” J.A. 522.
Candidate Trump later recharacterized his call to ban Muslims as a ban on nationals from certain countries or territories. On July 17, 2016, when asked about a tweet that said, “Calls to ban Muslims from entering the U.S. are offensive and unconstitutional,” then-candidate Trump responded, “So you call it territories. OK? We’re gonna do territories.” J.A. 798. He echoed this statement a week later in an interview with NBC’s Meet the Press. When asked whether he had “pulled back” on his “Muslim ban,” Trump replied, ‘We must immediately suspend immigration from any nation that has been compromised by terrorism until such time as proven vetting mechanisms have been put in place.” J.A. 480. Trump added, “I actually don’t think it’s a rollback. In fact, you could say it’s an expansion. I’m looking now at territories. People were so upset when I used the word Muslim. Oh, you can’t use the word Muslim. Remember this. And I’m okay with that, because I’m talking territory instead of Muslim.” J.A. 481. Trump continued, “Our Constitution is great.... Now, we have a religious, you know, everybody wants to be protected. And that’s great. And that’s the wonderful part of our Constitution. I view it differently.” J.A. 481.
On December 19, 2016, following a terrorist attack in Germany, President-Elect Trump lamented the attack on people who were “prepared to celebrate the Christmas holiday” by “ISIS and other Islamic terrorists [who] continually slaughter Christians in their communities and places of worship as part of their global jihad.” J.A. 506. Two days later, when asked whether recent violence in Europe had affected his plans to bar Muslims from immigrating to the United States, President-Elect Trump commented, ‘You know my plans. All along, I’ve been proven to be right. 100% correct. What’s happening is disgraceful.” J.A. 506.
The President gave an interview to the Christian Broadcasting News on January 27, 2017, the same day he issued the First Executive Order. In that interview, the President explained that EO-1 would give preference to Christian refugees: “They’ve been horribly treated. Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible....” J.A. 461. He found that situation “very, very unfair.” J.A. 461. Just before signing EO-1, President Trump stated, “This is the ‘Protection of the Nation from Foreign Terrorist Entry into the United States.’ We all know *577 what that means.” J.A. 403. The following day, former New York City Mayor and presidential advisor Rudolph Giuliani appeared on Fox News and was asked, “How did the President decide the seven countries?” J.A. 508. Giuliani answered, “I’ll tell you the whole history of it. So when [the President] first announced it, he said ‘Muslim ban.’ He called me up. He said, ‘Put a commission together. Show me the right way to do it legally.’ ” J.A. 508. Giuliani said he assembled a group of “expert lawyers” that “focused on, instead of religion, danger—the areas of the world that create danger for us.... It’s based on places where there [is] substantial evidence that people are sending terrorists into our country.” J.A. 508-09.
In response to the Ninth Circuit’s decision not to stay enforcement of the nationwide injunction, the President stated at a news conference on February 16, 2017, that he intended to issue a new executive order tailored to that court’s decision— despite his belief that the First Executive Order was lawful. See J.A. 334. In discussing the Ninth Circuit’s decision and his “[e]xtreme vetting” proposal, the President stated, “I got elected on defense of our country. I keep my campaign promises, and our citizens will be very happy when they see the result.” J.A. 352. A few days later Stephen Miller, Senior Policy Advisor to the President, explained that the new order would reflect “mostly minor, technical differences,” emphasizing that it would produce the “same basic policy outcome for the country.” J.A. 339. White House Press Secretary Sean Spicer stated, “The principles of the executive order remain the same.” J.A. 379. And President Trump, in a speech at a rally in Nashville, Tennessee, described EO-2 as “a watered down version of the first order.” Appellees’ Br. 7 (citing Katie Reilly, Read President Trump’s Response to the Travel Ban Ruling: It ‘Makes Us Look Weak, ’ Time (Mar. 16, 2017), http://time.com/4703622/ president-trump-speech-transcript-travel-ban-ruling/ (saved as ECF opinion attachment)).
At the March 6, 2017 press conference announcing the Second Executive Order, Secretary of State Rex Tillerson said, “This executive order is a vital measure for strengthening our national security.” J.A. 376. That same day, Attorney General Jefferson Sessions and Secretary of Homeland Security John Kelly submitted a letter to the President detailing how weaknesses in our immigration system compromise our nation’s security and recommending a temporary pause on entry of nationals from the Designated Countries. Appellants’ Br. 8 n.3 (citing Letter from Jefferson B. Sessions III, Attorney Gen., and John Francis Kelly, Sec’y of Homeland Sec., to President Donald J. Trump (Mar. 6, 2017)). In a CNN interview the next day, Secretary Kelly specified that there are probably “13 or 14 countries” that have “questionable vetting procedures,” not all of which are Muslim countries or in the Middle East. J.A. 411. He noted that there are “51 overwhelmingly Muslim countries” and rejected the characterization of EO-2 as a “Muslim ban.” J.A. 412.
C.
This action was brought by six individuals, all American citizens or lawful permanent residents who have at least one family member seeking entry into the United States from one of the Designated Countries, and three organizations that serve or represent Muslim clients or members.
Four of the individual Plaintiffs—John Doe #1, Jane Doe #2, John Doe #3, and Paul Harrison—allege that EO-2 would impact their immediate family members’ ability to obtain visas. J.A. 213-14, 245-52, *578 305, 308-09, 318-19. Collectively, they claim that Section 2(c) of EO-2, the provision that suspends entry for certain foreign nationals for ninety days, will prolong their separation from their loved ones. See, e.g., J.A. 306. John Doe #1 has applied for a spousal immigration visa so that his wife, an Iranian national, can join him in the United States; the application was approved, and she is currently awaiting her visa interview. J.A. 305. Jane Doe #2, a college student in the United States, has a pending 1-130 visa application on behalf of her sister, a Syrian refugee living in Saudi Arabia. J.A. 316, 318-19. Since the filing of the operative Complaint on March 10, 2017, two of Plaintiffs’ family members have obtained immigrant visas. The Government informed the district court that Paul Harrison’s fiancé secured and collected a visa on March 15, 2017, the day before EO-2 was to take effect. Appellants’ Br. 19 n.6 (citing J.A. 711-12, 715). Doe #3’s wife secured an immigrant visa on May 1, 2017, and Plaintiffs anticipate that she will arrive in the United States within the next eight weeks. J.A. 819. The remaining two individual Plaintiffs—Mu-hammed Meteab and Ibrahim Ahmed Mo-homed—allege that EO-2 would delay or deny the admission of their family members as refugees. J.A. 214, 249-50, 252, 313-14, 321-22.
Beyond claiming injury to their family relationships, several of the individual Plaintiffs allege that the anti-Muslim message animating EO-2 has caused them feelings of disparagement and exclusion. Doe #1, a scientist who obtained permanent resident status through the National Interest Waiver program for people with extraordinary abilities, references these “anti-Muslim views,” worries about his safety in this country, and contemplates whether he should return to Iran to be with his wife. J.A. 304, 306. Plaintiff Me-teab relays that the “anti-Muslim sentiment” motivating EO-2 had led him to feel “isolated and disparaged in [his] community.” J.A. 314. He explains that when he is in public with his wife, who wears a hijab, he “sense[s] a lot of hostility from people” and recounts that his nieces, who both wear a hijab, “say that people make mean comments and stare at them for being Muslim.” J.A. 314. A classmate “pulled the hijab off’ one of his nieces in class. J.A. 314.
Two of the organizational Plaintiffs, the International Refugee Assistance Project and the Hebrew Immigrant Aid Society, primarily assist refugees with the resettlement process. See J.A. 210-13, 235-43. These organizations claim that they have already diverted significant resources to dealing with EO-2’s fallout, and that they will suffer direct financial injury from the anticipated reduction in refugee cases. J.A. 238, 243, 276-77. They further claim that their clients, who are located in the United States and the Middle East, will be injured by the delayed reunification with their loved ones. J.A. 268, 282-83. The final Plaintiff, the Middle East Studies Association, an umbrella organization dedicated to fostering awareness of the Middle East, asserts that EO-2 will, among other injuries, reduce attendance at its annual conference and cause the organization to lose $18,000 in registration fees. J.A. 243-45, 300-03.
D.
Plaintiffs initiated this suit on February 7, 2017, seeking declaratory and injunctive relief against enforcement of the First Executive Order. Plaintiffs claimed that EO-1 violated the Establishment Clause of the First Amendment; the equal protection component of the Due Process Clause of the Fifth Amendment; the Immigration and Nationality Act (“INA”), 8 U.S.C. *579 §§ 1101-1537 (2012); the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4 (2012); the Refugee Act, 8 U.S.C. §§ 1521-24 (2012); and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2012). They named as Defendants the President, DHS, the Department of State, the Office of the Director of National Intelligence, the Secretary of Homeland Security, the Secretary of State, and the Director of National Intelligence.
On March 10, 2017, four days after the President issued EO-2, Plaintiffs filed the operative Complaint, along with a motion for a TRO and/or preliminary injunction. Plaintiffs sought to enjoin implementation of EO-2 in its entirety, prior to its effective date. In quick succession, the Government responded to the motion, Plaintiffs filed a reply, and the parties appeared for a hearing.
The district court construed the motion as a request for a preliminary injunction, and on March 16, 2017, it granted in part and denied in part that motion. Int’l Refugee Assistance Project, — F.Supp.3d at —, 2017 WL 1018235, at *1. In its Memorandum Opinion, the district court first found that three individual Plaintiffs (Doe #1, Doe #2, and Doe #3) had standing to bring the claim that Section 2(c) violates the INA’s provision prohibiting discrimination on the basis of nationality in the issuance of immigrant visas, 8 U.S.C. § 1152(a)(1)(A). Id. at —, at *6. The court also determined that at least three individual Plaintiffs (Meteab, Doe #1, and Doe #3) had standing to pursue the claim that EO-2 violates the Establishment Clause. Id. at —, at *7.
After finding Plaintiffs’ claims justiciable, the district court turned to the merits of their claims. The court determined that Plaintiffs are likely to succeed only in part on the merits of their INA claim. Id. at —, at *10. It found that Section 2(c) likely violates § 1152(a)(1)(A), but only as to its effective bar on the issuance of immigrant visas, because § 1152(a)(1)(A) explicitly applies solely to immigrant visas. To the extent that Section 2(c) prohibits the issuance of nonimmigrant visas and bars entry on the basis of nationality, the court found that it was not likely to violate § 1152(a)(1)(A). Id. The court did not discuss this claim in addressing the remaining preliminary injunction factors.
The district court next found that Plaintiffs are likely to succeed on the merits of their Establishment Clause claim. Id. at —, at *16. It then considered the remaining preliminary injunction requirements, but only as to the Establishment Clause claim: it found that Plaintiffs would suffer irreparable injury if EO-2 were to take effect, that the balance of the equities weighed in Plaintiffs’ favor, and that a preliminary injunction was in the public interest. Id. at —, at *17. The district court concluded that a preliminary injunction was therefore proper as to Section 2(c) of EO-2 because Plaintiffs’ claims centered primarily on that provision’s suspension of entry. The court accordingly issued a nationwide injunction barring enforcement of Section 2(c). Id. at —, at *18.
Defendants timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).
II.
Because the district court enjoined Section 2(c) in its entirety based solely on Plaintiffs’ Establishment Clause claim, we need not reach the merits of Plaintiffs’ statutory claim under the INA.
In Section 2(c) of EO-2, the President suspended the entry of nationals from the six Designated Countries, pursuant to his power to exclude aliens under Section 212(f) of the INA, codified at 8 U.S.C. *580 § 1182(f), and Section 215(a)(1) of the INA, codified at 8 U.S.C. § 1185(a)(1). The Government contends that Section 2(c)’s suspension of entry falls squarely within the “expansive authority” granted to the President by § 1182(f)[6] and § 1185(a)(1).[7] Appellants’ Br. 28. Plaintiffs, on the other hand, argue that Section 2(c) violates a separate provision of the INA, Section 202(a)(1)(A), codified at 8 U.S.C. § 1152(a)(1)(A), prohibiting discrimination on the basis of nationality “in the issuance of immigrant visas.”[8]
The district court determined that Plaintiffs are likely to succeed on their claim under § 1152(a)(1)(A) only in limited part. Because Section 2(c) has the practical effect of halting the issuance of immigrant visas on the basis of nationality, the court reasoned, it is inconsistent with § 1152(a)(1)(A). To that extent—and contrary to the Government’s position—the court found that Presidential authority under § 1182(f) and § 1185(a)(1) is cabined by the INA’s prohibition on nationality-based discrimination in visa issuance. But the district court’s ruling was limited in two important respects. First, because § 1152(a)(1)(A) applies only to the issuance of immigrant visas, the district court discerned no conflict between that provision and the application of Section 2(c) to persons seeking non-immigrant visas. And second, the district court found that because § 1152(a)(1)(A) governs the issuance of visas rather than actual entry into the United States, it poses no obstacle to enforcement of Section 2(c)’s nationality-based entry bar. The district court summarized as follows:
Plaintiffs have shown a likelihood of success on the merits of their claim that the Second Executive Order violates § 1152(a), but only as to the issuance of immigrant visas.... They have not shown a likelihood of success on the merits of the claim that § 1152(a) prevents the President from barring entry to the United States pursuant to § 1182(f), or the issuance of non-immigrant visas, on the basis of nationality.
Int'l Refugee Assistance Project, — F.Supp.3d at —, 2017 WL 1018235, at *10.
This narrow statutory ruling is not the basis for the district court’s broad preliminary injunction enjoining Section 2(c) of EO-2 in all of its applications. Rather, Plaintiffs’ constitutional claim, the district court determined, was what justified a nationwide preliminary injunction against any enforcement of Section 2(c). If we were to disagree with the district court that § 1152(a)(1)(A) partially restrains the *581 President’s authority under § 1182(f) and § 1185(a)(1), then we would be obliged to consider Plaintiffs’ alternative Establishment Clause claim. And, importantly, even if we were to agree with the district court’s statutory analysis, we still would be faced with the question of whether the scope of the preliminary injunction, which goes beyond the issuance of immigrant visas governed by § 1152(a)(1)(A) to enjoin Section 2(c) in its entirety, can be sustained on the basis of Plaintiffs’ Establishment Clause claim.
In light of this posture, we need not address the merits of the district court’s statutory ruling. We recognize, of course, the doctrine of constitutional avoidance, which counsels against the issuance of “unnecessary constitutional rulings.” Am. Foreign Serv. Ass’n v. Garfinkel, 490 U.S. 153, 161, 109 S.Ct. 1693, 104 L.Ed.2d, 139 (1989) (per curiam). But as we have explained, the district court’s constitutional ruling was necessary to its decision, and review of that ruling is necessary to ours. Accordingly, we decline to reach the merits of Plaintiffs’ claim under § 1152(a)(1)(A). The breadth of the preliminary injunction issued by the district court may be justified if and only if Plaintiffs can satisfy the requirements for a preliminary injunction based on their Establishment Clause claim. We therefore turn to consider that claim.
III.
The Government first asks us to reverse the preliminary injunction on the grounds that Plaintiffs’ Establishment Clause claim is non-justieiable. In its view, Plaintiffs have not satisfied the foundational Article III requirements of standing and ripeness, and in any event, the doctrine of consular nonreviewability bars judicial review of their claim. We consider these threshold challenges in ton.
A.
The district court found that at least three individual Plaintiffs—Mu-hammed Meteab, Doe #1, and Doe #3— have standing to assert the claim that EO-2 violates the Establishment Clause. We review this legal determination de novo. Peterson v. Nat’l Telecomms. & Info. Admin., 478 F.3d 626, 631 n.2 (4th Cir. 2007).
The Constitution’s gatekeeping requirement that federal courts may only adjudicate “Cases” or “Controversies,” U.S. Const. art. Ill, § 2, obligates courts to determine whether litigants have standing to bring suit, Clapper v. Amnesty Int'l USA, 568 U.S. 398, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013). To demonstrate standing and thus invoke federal jurisdiction, a party must establish that “(1) it has suffered an injury in fact, (2) the injury is fairly traceable to the defendants’ actions, and (3) it is likely, and not merely speculative, that the injury will be redressed by a favorable decision.” Long Term Care Partners, LLC v. United States, 516 F.3d 225, 231 (4th Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The parties’ core dispute is whether Plaintiffs have suffered a cognizable injury. To establish a cognizable injury, “a plaintiff must show that he or she suffered ‘an invasion of a legally protected interest’ that is ‘concrete and particularized’ and ‘actual or imminent, not conjectural or hypothetical.’ ” Spokeo, Inc. v. Robins, — U.S. —, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (quoting Lujan, 504 U.S. at 560, 112 S.Ct. 2130); see also Beck v. McDonald, 848 F.3d 262, 270-71 (4th Cir. 2017).
In evaluating standing, “the court must be careful not to decide the question-on the merits for or against the plaintiff, and must therefore assume that on the *582 merits the plaintiffs would be successful in their claims.” Cooksey v. Futrell, 721 F.3d 226, 239 (4th Cir. 2013) (quoting City of Waukesha v. EPA, 320 F.3d 228, 235 (D.C. Cir. 2003)); see also Parker v. District of Columbia, 478 F.3d 370, 377 (D.C. Cir. 2007), aff'd by District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (“The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of his or her legal claim.”). This means, for purposes of standing, we must assume that Section 2(c) violates the First Amendment’s prohibition against governmental “establishment of religion.”
“Standing in Establishment Clause cases may be shown in various ways,” Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 129, 131 S.Ct. 1436, 179 L.Ed.2d 523 (2011), though as oft-repeated, “the concept of injury for standing purposes is particularly elusive” in this context, Suhre v. Haywood County, 131 F.3d 1083, 1085 (4th Cir. 1997) (quoting Murray v. City of Austin, 947 F.2d 147, 151 (5th Cir. 1991)). Nevertheless, the Supreme Court and this Circuit have developed a set of rules that guide our review.
To establish standing for an Establishment Clause claim, a plaintiff must have “personal contact with the alleged establishment of religion.” Id. at 1086 (emphasis added). A “mere abstract objection to unconstitutional conduct is not sufficient to confer standing.” Id. The Supreme Court has reinforced this principle in recent years: “plaintiffs may demonstrate standing based on the direct harm of what is claimed to be an establishment of religion.” Winn, 563 U.S. at 129, 131 S.Ct. 1436. This “direct harm” can resemble injuries in other contexts. Merchants who suffered economic injury, for instance, had standing to challenge Sunday closing laws as violative of the Establishment Clause. McGowan v. Maryland, 366 U.S. 420, 430-31, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Czyzewski v. Jevic Holding Corp., — U.S. —, 137 S.Ct. 973, 983, 197 L.Ed.2d 398 (2017) (noting that, in McGowan, appellants who were “fined $5 plus costs had standing”). But because Establishment Clause violations seldom lead to “physical injury or pecuniary loss,” the standing inquiry has been adapted to also include “the kind of injuries Establishment Clause plaintiffs” are more “likely to suffer.” Suhre, 131 F.3d at 1086. As such, “noneco-nomic or intangible injury may suffice to make an Establishment Clause claim justi-ciable.” Id. “Feelings of marginalization and exclusion are cognizable forms of injury,” we recently explained, “particularly in the Establishment Clause context, becaúse one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion ‘that they are outsiders, not full members of the political community.’ ” Moss v. Spartanburg Cty. Sch. Dist. Seven, 683 F.3d 599, 607 (4th Cir. 2012) (quoting McCreary County v. ACLU of Ky., 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005)).
Doe #1—who is a lawful permanent resident of the United States, Muslim, and originally from Iran—filed a visa application on behalf of his wife, an Iranian national. Her application has been approved, and she is currently awaiting her consular interview. J.A. 305. If it took effect, EO-2 would bar the entry of Doe #l’s wife. Doe #1 explains that because EO-2 bars his wife’s entry, it “forces [him] to choose between [his] career and being with [his] wife,” and he is unsure “whether to keep working here” as a scientist or to return to Iran. J.A. 306. Doe #1 adds that EO-2 has “created significant fear, anxiety, *583 and insecurity” for him and his wife. He highlights the “statements that have been made about banning Muslims from entering, and the broader context,” and states, “I worry that I may not be safe in this country.” J.A. 306; see also J.A. 314 (Plaintiff Meteab describing how the “anti-Muslim sentiment motivating” EO-2 has led him to feel “isolated and disparaged in [his] community”).
Doe #1 has therefore asserted two distinct injuries stemming from his “personal contact” with the alleged establishment of religion—EO-2. Suhre, 131 F.3d at 1086. First, EO-2 will bar his wife’s entry into the United States and prolong their separation. And second, EO-2 sends á state-sanctioned message condemning his religion and causing him to feel excluded and marginalized in his community.
We begin with Doe #l’s allegation that EO-2 will prolong his separation from his wife. This Court has found that standing can be premised on a “threatened rather than actual injury,” Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 160 (4th Cir. 2000) (en banc), as long as this “threat of injury [is] both real and immediate,” Beck, 848 F.3d at 277 (quoting Lebron v. Rumsfeld, 670 F.3d 540, 560 (4th Cir. 2012)). The purpose of the longstanding “imminence” requirement, which is admittedly “a somewhat elastic concept,” is “to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is ‘certainly impending.’ ” Lujan, 504 U.S. at 564 n.2, 112 S.Ct. 2130 (quoting Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)).
The Government does not contest that, in some circumstances, the prolonged separation of family members can constitute an injury-in-fact. The Government instead argues that Doe #1’s claimed injury is speculative and non-imminent, Appellants’ Br. 19, such that it is not “legally and judicially cognizable.” Id. at 18 (quoting Raines v. Byrd, 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)). According to the Government, Doe #1 has failed to show that his threatened injury— prolonged separation from his wife—is imminent. It asserts that Doe #1 has offered no reason to believe that Section 2(c)’s “short pause” on entry “will delay the issuance of [his wife’s] visa.” Appellants’ Br. 19.
But this ignores that Section 2(c) appears to operate by design to delay the issuance of visas to foreign nationals. Section 2(c)’s “short pause” on entry effectively halts the issuance of visas for ninety days—as the Government acknowledges, it “would be pointless to issue a visa to an alien who the consular officer already knows is barred from entering the country.” Appellants’ Br. 32; see also Brief for Cato Institute as Amicus Curiae Supporting Appellees 25-28, ECF No. 185 (arguing that Section 2(c) operates as a ban on visa issuance). The Government also cites 8 U.S.C. § 1201(g), which provides in relevant part that “[n]o visa or other documentation shall be issued to an alien if [ ] it appears to the consular officer ... that such alien is ineligible to receive a visa or other documentation under section 1182 of this title.” See also U.S. Dep’t of State, 9 Foreign Affairs Manual 302.14-3(B) (2016). A ninety-day pause on issuing visas would seem to necessarily inject at least some delay into any pending application’s timeline. And in fact, the Government suggests that pending visa applications might not be delayed, but denied. See Appellants’ Br. 33 (explaining that “when an alien subject to the Order is denied an immigrant visa, ... he is being denied a visa because he has been validly barred from entering the country”). A denial on such *584 grounds would mean that once the entry suspension period concludes, an alien would have to restart from the beginning the lengthy visa application process. What is 'more, Section 2(c) is designed to “reduce investigative burdens on relevant agencies” to facilitate worldwide review of the current procedures for “screening and vetting of foreign nationals.” Logically, dedicating time and resources to a global review process will further slow the adjudication of pending applications.
Here, Doe #1 has a pending visa application on behalf of his wife, seeking her admission to the United States from one of the Designated Countries. Prior to EO-2’s issuance, Doe #1 and his wife were nearing the end of the lengthy immigrant visa process, as they were waiting for her consular interview to be scheduled. J.A. 305. They had already submitted a petition, received approval of that petition, begun National Visa Center (“NVC”) Processing, submitted the visa application form, collected and submitted the requisite financial and supporting documentation to NVC, and paid the appropriate fees. J.A. 305; see U.S. Dep’t of State, The Immigrant Visa Process, https://travel.state.gov/content/ visas/en/immigrate/immigrant-process.html (last visited May 14, 2017) (saved as ECF opinion attachment) (diagramming steps of the immigrant-visa application process). If Section 2(c) were in force—restricting the issuance of visas to nationals in the Desig-. nated Countries for ninety days and initiating the worldwide review of existing visa standards—we find a “real and immediate” threat that it would prolong Doe #l’s separation from his wife, either by delaying the issuance of her visa or denying her visa and forcing her to restart the application process. Beck, 848 F.3d at 277 (quoting Lebron, 670 F.3d at 560).
This prolonged family separation is not, as the Government asserts, a remote or speculative possibility. Unlike threatened injuries that rest on hypothetical actions a plaintiff may take “some day,” Lujan, 504 U.S. at 564, 112 S.Ct. 2130, or on a “highly attenuated chain of possibilities,” Clapper, 133 S.Ct. at 1148, the threatened injury here is imminent, sufficiently “real” and concrete, Spokeo, 136 S.Ct. at 1549, and would harm Doe #1 in a personal and “particularized” way, id. at 1548. The progression of Doe #3’s wife’s visa application illustrates this. Doe #3’s wife received a visa on May 1, 2017, while Section 2(c) was enjoined. If Section 2(c) had been in effect, she would have been ineligible to receive a visa until after the expiration of the ninety-day period. See 8 U.S.C. § 1201(g). Put simply, Section 2(c) would have delayed the issuance of Doe #3’s wife’s visa. This' cuts directly against the Government’s assertion that it is uncertain whether or how Section 2(c) would affect visa applicants. Clearly Section 2(c) will delay and disrupt pending visa applications.
Even more, flowing from EO-2 is the alleged state-sanctioned message that foreign-born Muslims, a group to which Doe #1 belongs, are “outsiders, not full members of the political community.” Moss, 683 F.3d at 607 (quoting McCreary, 545 U.S. at 860, 125 S.Ct. 2722).[9] Doe #1 explains how the Second Executive Order *585 has caused him to fear for his personal safety in this country and wonder whether he should give up his career in the United States and return to Iran to be with his wife. J.A. 306. This harm is consistent with the “[f]eelings of marginalization and exclusion” injury we recognized in Moss. 683 F.3d at 607.
In light of these two injuries, we find that Doe #1 has had “personal contact with the alleged establishment of religion.” Suhre, 131 F.3d at 1086. Regardless of whether EO-2 actually violates the Establishment Clause’s command not to disfavor a particular religion, a merits inquiry explored in Section IV.A, his injuries are on par with, if not greater than, injuries we previously deemed sufficient in this context. See Moss, 683 F.3d at 607 (finding Jewish daughter and father who received letter describing public school policy of awarding academic credit for private, Christian religious instruction suffered injury in part because they were made to feel like “ ‘outsiders’ in their own community”).[10]
The Government attempts to undercut these injuries in several ways. It first frames Plaintiffs’ injuries as “stress.” Appellants’ Br. 23. That minimizes the psychological harm that flows from confronting official action preferring or disfavoring a particular religion and, in any event, does not account for the impact on families. The Government next argues that because the Second Executive Order “directly applies only to aliens abroad from the specified countries,” it is “not directly targeted at plaintiffs,” who are based in the United States, “in the way that local- or state-government messages are.” Appellants’ Reply Br. 3. An executive order is of course different than a local Sunday closing law or a Ten Commandments display in a state courthouse, but that does not mean its impact is any less direct. Indeed, because it emanates from the highest elected office in the nation, its impact is arguably felt even more directly by the individuals it affects. From Doe #l’s perspective, the Second Executive Order does not apply to arbitrary or anonymous “aliens abroad.” It applies to his wife.
More than abstractly disagreeing with the wisdom or legality of the President’s policy decision, Plaintiffs show how EO-2 impacted (and continues to impact) them personally. Doe #1 is not simply “roamfing] the country in search of governmental wrongdoing.” Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 487, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Rather, he is feeling the direct, painful effects of the Second Executive Order— both its alleged message of religious condemnation and the prolonged separation it causes between him and his wife—in his everyday life.[11] This case thus bears little resemblance to Valley Forge.
*586 We likewise reject the Government’s suggestion that Plaintiffs are seeking to vindicate the legal rights of third parties. The prudential standing doctrine includes a “general prohibition on a litigant’s raising another person’s legal rights.” CGM, LLC v. BellSouth Tele-comms., Inc., 664 F.3d 46, 52 (4th Cir. 2011) (quoting Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). This “general prohibition” is not implicated here, however, as Doe #1 has shown that he himself suffered injuries as a result of the challenged Order.[12]
For all of these reasons, we find that Doe #1 has met his burden to establish an Article III injury. We further find that Doe #1 has made the requisite showing that his claimed injuries are causally related to the challenged conduct—the Second Executive Order—as opposed to “the independent action of some third party not before the court.” Cooksey, 721 F.3d at 238 (quoting Frank Krasner Enters., Ltd. v. Montgomery County, 401 F.3d 230, 234 (4th Cir. 2005)). Enjoining enforcement of Section 2(c) therefore will likely redress those injuries. Doe #1 has thus met the constitutional standing requirements with respect to the Establishment Clause claim. And because we find that at least one Plaintiff possesses standing, we need not decide whether the other individual Plaintiffs or the organizational Plaintiffs have standing with respect to this claim. See Bostic v. Schaefer, 760 F.3d 352, 370 (4th Cir. 2014).
Lastly, the Government asserts that Plaintiffs’ Establishment Clause claim is unripe. It argues that under EO-2, Plaintiffs’ relatives can apply for a waiver, and unless and until those waiver requests *587 are denied, Plaintiffs’ claims are dependent on future uncertainties. When evaluating ripeness, we consider “(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.” Id. (quoting Nat’l Park Hosp. Ass’n v. Dep’t of Interior, 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003)). An action is fit for resolution “when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties.” Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006). The “hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiff].” Lansdowne on the Potomac Homeowners Ass’n, Inc. v. OpenBand at Lansdowne, LLC, 713 F.3d 187, 199 (4th Cir. 2013) (quoting Charter Fed. Sav. Bank v. Office of Thrift Supervision, 976 F.2d 203, 208-09 (4th Cir. 1992)).
Our ripeness doctrine is clearly not implicated here. Plaintiffs have brought a facial challenge, alleging that EO-2 violates the Establishment Clause regardless of whether their relatives secure waivers. This legal question is squarely presented for our review and is not dependent on the factual uncertainties of the waiver process. What is more, Plaintiffs will suffer undue hardship, as explained above, were we to require their family members to attempt to secure a waiver before permitting Plaintiffs to challenge Section 2(c). We accordingly find the claim ripe for judicial decision.
B.
In one final justiciability challenge, the Government asserts that consular nonreviewability bars any review of Plaintiffs’ claim. This Court has scarcely discussed the doctrine, so the Government turns to the District of Columbia Circuit, which has stated that “a consular official’s decision to issue or withhold a visa is not subject to judicial review, at least unless Congress says otherwise.” Saavedra Bruno v. Albright, 197 F.3d 1153, 1159 (D.C. Cir. 1999). But in the same opinion, the court explained that judicial review was proper in cases involving “claims by United States citizens rather than by aliens ... and statutory claims that are accompanied by constitutional ones.” Id. at 1163 (quoting Abourezk v. Reagan, 785 F.2d 1043, 1051 n.6 (D.C. Cir. 1986)). This is precisely such a case. More fundamentally, the doctrine of consular nonreviewability does not bar judicial review of constitutional claims. See, e.g., Din, 135 S.Ct. at 2132 (reviewing visa denial where plaintiff asserted due process claim). The Government’s reliance on the doctrine is therefore misplaced.
Behind the casual assertion of consular nonreviewability lies a dangerous idea—that this Court lacks the authority to review high-level government policy of the sort here. Although the Supreme Court has certainly encouraged deference in our review of immigration matters that implicate national security interests, see infra Section IV.A, it has not countenanced judicial abdication, especially where constitutional rights, values, and principles are at stake. To the contrary, the Supreme Court has affirmed time and again that “it is emphatically the province and duty of the judicial department to say what the law is.” Marbury v. Madison, 1 Cranch 137, 177, 2 L.Ed. 60 (1803). This “duty will sometimes involve the ‘resolution of litigation challenging the constitutional authority of one of the three branches,’ but courts cannot avoid their responsibility.” Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 196, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012) (quoting INS v. Chadha, 462 U.S. 919, 943, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). In light of this duty, and having determined that the *588 present ease is justiciable, we now proceed to consider whether the district court properly enjoined Section 2(c) of the Second Executive Order.
IV.
A preliminary injunction is an “extraordinary remedfy] involving the exercise of very far-reaching power” and is “to be granted only sparingly and in limited circumstances.” MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 816 (4th Cir. 1991)). For a district court to grant a preliminary injunction, “a plaintiff ‘must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.’ ” WV Ass’n of Club Owners & Fraternal Servs., Inc. v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009) (quoting Winter v. Nat. Res. Defense Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). The district court found that Plaintiffs satisfied all four requirements as to their Establishment Clause claim, and it enjoined Section 2(c) of EO-2. We evaluate the court’s findings for abuse of discretion, Aggarao v. MOL Ship Mgmt. Co., Ltd., 675 F.3d 355, 366 (4th Cir. 2012), reviewing its factual findings for clear error and its legal conclusions de novo, Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011).
A.
The district court determined that Plaintiffs are likely to succeed on the merits of their claim that EO-2 violates the Establishment Clause. Int’l Refugee Assistance Project, — F.Supp.3d at —, 2017 WL 1018235, at *16. It found that because EO-2 is “facially neutral in terms of religion,” id. at —, at *13, the test outlined in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), governs the constitutional inquiry. And applying the Lemon test, the court found that EO-2 likely violates the Establishment Clause. The Government argues that the court erroneously applied the Lemon test instead of the more deferential test set forth in Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). And under Mandel, the Government contends, Plaintiffs’ claim fails.
I.
We begin by addressing the Government’s argument that the district court applied the wrong test in evaluating Plaintiffs’ constitutional claim. The Government contends that Mandel sets forth the appropriate test because it recognizes the limited scope of judicial review of executive action in the immigration context. Appellants’ Br. 42. We agree that Mandel is the starting point for our analysis, but for the reasons that follow, we find that its test contemplates the application of settled Establishment Clause doctrine in this case.
In Mandel, American university professors had invited Mandel, a Belgian citizen and revolutionary Marxist and professional journalist, to speak at a number of conferences in the United States. 408 U.S. at 756, 92 S.Ct. 2576. But Mandel’s application for a nonimmigrant visa was denied under a then-existing INA provision that barred the entry of aliens “who advocate the economic, international, and governmental doctrines of world communism.” 8 U.S.C. § 1182(a)(28)(D) (1964). The Attorney General had discretion to waive § 1182(a)(28)(D)’s bar and grant Mandel an individual exception, but declined to do so on the grounds that Mandel had violated the terms of his visas during prior visits *589 to the United States. 408 U.S. at 759, 92 S.Ct. 2576. The American professors sued, alleging, among other things, that the denial of Mandel’s visa violated their First Amendment rights to “hear his views and engage him in a free and open academic exchange.” Id. at 760, 92 S.Ct. 2576.
The Supreme Court, citing “Congress’ ‘plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden,’ ” id. at 766, 92 S.Ct. 2576 (quoting Boutilier v. INS, 387 U.S. 118, 123, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967)), found that the longstanding principle of deference to the political branches in the immigration context limited its review of plaintiffs’ challenge, id. at 767, 92 S.Ct. 2576. The Court held that “when the Executive exercises this power [to exclude an alien] on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the [plaintiffs’] First Amendment interests.” Id. at 770, 92 S.Ct. 2576. The Court concluded that the Attorney General’s stated reason for denying Mandel’s visa—that he had violated the terms of prior visas—satisfied this test.[13] It therefore did not review plaintiffs’ First Amendment claim.
Courts have continuously applied Mandel’s “facially legitimate and bona fide” test to challenges to individual visa denials. See Din, 135 S.Ct. at 2139-40 (Kennedy, J., concurring in the judgment) (applying Mandel’s, test to challenge to visa denial); Cardenas v. United States, 826 F.3d 1164, 1172-73 (9th Cir. 2016) (same); Am. Acad. of Religion v. Napolitano, 573 F.3d 115, 125 (2d Cir. 2009) (same). Subsequently, in Fiallo v. Bell, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), the Supreme Court applied Mandel’s test to a facial challenge to an immigration law, finding “no reason to review the broad congressional policy choice at issue here under a more exacting standard than was applied in Kleindienst v. Mandel, a First Amendment case.” Id. at 795, 97 S.Ct. 1473. And in a case where plaintiffs brought a constitutional challenge to an immigration law, this Court has found that “we must apply the same standard as the Fiallo court and uphold the statute if a ‘facially legitimate and bona fide reason’ supports [it].” Johnson v. Whitehead, 647 F.3d 120, 127 (4th Cir. 2011).[14] Mandel is therefore the starting point for our review.
*590 But in another more recent line of cases, the Supreme Court has made clear that despite the political branches’ plenary power over immigration, that power is still “subject to important constitutional limitations,” Zadvydas v. Davis, 533 U.S. 678, 695, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), and that it is the judiciary’s responsibility to uphold those limitations. Chadha, 462 U.S. at 941, 103 S.Ct. 2764 (stating that Congress and the Executive must “chofose] a constitutionally permissible means of implementing” their authority over immigration). These cases instruct that the political branches’ power over immigration is not tantamount to a constitutional blank check, and that vigorous judicial review is required when an immigration action’s constitutionality is in question.
We are bound to give effect to both lines of cases, meaning that we must enforce constitutional limitations on immigration actions while also applying Mandel's deferential test to those actions as the Supreme Court has instructed. For the reasons that follow, however, we find that these tasks are not mutually exclusive, and that Mandel's test still contemplates meaningful judicial review of constitutional challenges in certain, narrow circumstances, as we have here.
To begin, Mandel's test undoubtedly imposes a heavy burden on plaintiffs, consistent with the significant deference we afford the political branches in the immigration context. See Mathews v. Diaz, 426 U.S. 67, 82, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (describing the “narrow standard of [judicial] review of decisions made by the Congress or the President in the area of immigration and naturalization”). The government need only show that the challenged action is “facially legitimate and bona fide” to defeat a constitutional challenge. Mandel, 408 U.S. at 770, 92 S.Ct. 2576. These are separate and quite distinct requirements. To be “facially legitimate,” there must be a valid reason for the challenged action stated on the face of the action. Din, 135 S.Ct. at 2140-41 (Kennedy, J., concurring in the judgment) (finding visa denial “facially legitimate” where government cited a statutory provision in support of the denial).
And as the name suggests, the “bona fide” requirement concerns whether the government issued the challenged action in good faith. In Kerry v. Din, Justice Kennedy, joined by Justice Alito, elaborated on this requirement. Id. at 2141.[15] Here, the burden is on the plaintiff. Justice Kennedy explained that where a plaintiff makes “an affirmative showing of bad faith” that is “plausibly alleged with sufficient particularity,” courts may “look behind” the challenged action to assess its *591 “facially legitimate” justification. Id. (suggesting that if plaintiff had sufficiently alleged that government denied visa in bad faith, court should inquire whether the government’s stated statutory basis for denying the visa was the actual reason for the denial). In the typical case, it will be difficult for a plaintiff to make an affirmative showing of bad faith with plausibility and particularity. See, e.g., Cardenas, 826 F.3d at 1173 (applying Din and finding that plaintiff who alleged that consular officer refused to consider relevant evidence and acted based on racial bias had failed to make an affirmative showing of bad faith). And absent this affirmative showing, courts must defer to the government’s “facially legitimate’’ reason for the action.
Mandel therefore clearly sets a high bar for plaintiffs seeking judicial review of a constitutional challenge to an immigration action. But although Mandel’s “facially legitimate and bona fide” test affords significant deference to the political branches’ decisions in this area, it does not completely insulate those decisions from any meaningful review. Where plaintiffs have seriously called into question whether the stated reason for the challenged action was provided in good faith, we understand Mandel, as construed by Justice Kennedy in his controlling concurrence in Din, to require that we step away from our deferential posture and look behind the stated reason for the challenged action. In other words, Mandel’s requirement that an immigration action be “bona fide” may in some instances compel more searching judicial review. Plaintiffs ask this Court to engage in such searching review here under the traditional Establishment Clause test, and we therefore turn to consider whether such a test is warranted.
We start with Mandel’s requirement that the challenged government action be “facially legitimate.” E0-2’s stated purpose is “to protect the Nation from terrorist activities by foreign nationals admitted to the United States.” EO-2, Preamble. We find that this stated national security interest is, on its face, a valid reason for Section 2(e)’s suspension of entry. EO-2 therefore satisfies Mandel’s first requirement. Absent allegations of bad faith, our analysis would end here in favor of the Government. But in this case, Plaintiffs have alleged that EO-2’s stated purpose was given in bad faith. We therefore must consider whether they have made the requisite showing of bad faith.
As noted, Plaintiffs must “plausibly allege[] with sufficient particularity” that the reason for the government action was provided in bad faith. Din, 135 S.Ct. at 2141 (Kennedy, J., concurring in the judgment). Plaintiffs here claim that EO-2 invokes national security in bad faith, as a pretext for what really is an anti-Muslim religious purpose. Plaintiffs point to ample evidence that national security is not the true reason for EO-2, including, among other things, then-candidate Trump’s numerous campaign statements expressing animus towards the Islamic faith; his proposal to ban Muslims from entering the United States; his subsequent explanation that he would effectuate this ban by targeting “territories” instead of Muslims directly; the issuance of EO-1, which targeted certain majority-Muslim nations and included a preference for religious minorities; an advisor’s statement that the President had asked him to find a way to ban Muslims in a legal way; and the issuance of EO-2, which resembles EO-1 and which President Trump and his advisors described as having the same policy goals as EO-1. See, e.g., J.A. 339, 346, 370, 379, 403, 470, 472, 480, 481, 506, 508, 516-18, 522, 798. Plaintiffs also point to the com *592 parably weak evidence that EO-2 is meant to address national security interests, including the exclusion of national security agencies from the decisionmaking process, the post hoc nature of the national security rationale, and evidence from DHS that EO-2 would not operate to diminish the threat of potential terrorist activity.
Based on this evidence, we find that Plaintiffs have more than plausibly alleged that EO-2’s stated national security interest was provided in bad faith, as a pretext for its religious purpose. And having concluded that the “facially legitimate” reason proffered by the government is not “bona fide,” we no longer defer to that reason and instead may “look behind” EO-2. Din, 135 S.Ct. at 2141 (Kennedy, J., concurring in the judgment).
Since Justice Kennedy’s concurrence in Din, no court has confronted a scenario where, as here, plaintiffs have plausibly alleged with particularity that an immigration action was taken in bad faith. We therefore have minimal guidance on what “looking] behind” a challenged immigration action entails. See id. In addressing this issue of first impression, the Government does not propose a framework for this inquiry. Rather, the Government summarily asserts that because EO-2 states that it is motivated by national security interests, it therefore satisfies Mandel’s test. But this only responds to Mandel’s “facially legitimate” requirement—it reads out Mandel ’s “bona fide” test altogether. Plaintiffs, for their part, suggest that we review their claim using our normal constitutional tools. And in the Establishment Clause context, our normal constitutional tool for reviewing facially neutral government actions is the test in Lemon v. Kurtzman.
We find for several reasons that because Plaintiffs have made an affirmative showing of bad faith, applying the Lemon test to analyze EO-2’s constitutionality is appropriate. First, as detailed above, the Supreme Court has unequivocally stated that the political branches’ immigration actions are still “subject to important constitutional limitations.” Zadvydas, 533 U.S. at 695, 121 S.Ct. 2491; see also Chadha, 462 U.S. at 941-42, 103 S.Ct. 2764. The constitutional limitation in this case is the Establishment Clause, and this Court’s duty to uphold the Constitution even in the context of a presidential immigration action counsels in favor of applying our standard constitutional tool. Second, that Plaintiffs have satisfied Mandel’s heavy burden to plausibly show that the reason for the challenged action was proffered in bad faith further supports the application of our established constitutional doctrine. The deferential framework set forth in Mandel is based in part on general respect for the political branches’ power in the immigration realm. Once plaintiffs credibly call into question the political branches’ motives for exercising that power, our reason for deferring is severely undermined. In the rare case where plaintiffs plausibly allege bad faith with particularity, more meaningful review—in the form of constitutional scrutiny—is proper. And third, in the context of this case, there is an obvious symmetry between Mandel’s “bona fide” prong and the constitutional inquiry established in Lemon. Both tests ask courts to evaluate the government’s purpose for acting.
Because Plaintiffs have made a substantial and affirmative showing that the government’s national security purpose was proffered in bad faith, we find it appropriate to apply our longstanding Establishment Clause doctrine. Applying this doctrine harmonizes our duty to engage in the substantial deference required by Mandel and its progeny with our responsibility to ensure that the political branches choose constitutionally permissible means of exer *593 cising their immigration power. We therefore proceed to “look behind” EO-2 using the framework developed in Lemon to determine if EO-2 was motivated by a primarily religious purpose, rather than its stated reason of promoting national security.
2.
To prevail under the Lemon test, the Government must show that the challenged action (1) “ha[s] a secular legislative purpose,” (2) that “its principal or primary effect [is] one that neither advances nor inhibits religion,” and (3) that it does “not foster ‘an excessive government entanglement with religion.’ ” Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105 (quoting Walz v. Tax Comm’n of the City of New York, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)) (citation omitted). The Government must satisfy all three prongs of Lemon to defeat an Establishment Clause challenge. Edwards v. Aguillard, 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). The dispute here centers on Lemon's first prong.
In the Establishment Clause context, “purpose matters.” McCreary, 545 U.S. at 866 n.14, 125 S.Ct. 2722. Under the Lemon test’s first prong, the Government must show that the challenged action “ha[s] a secular legislative purpose.” Lemon, 403 U.S. at 612, 91 S.Ct. 2105. Accordingly, the Government must show that the challenged action has a secular purpose that is “genuine, not a sham, and not merely secondary to a religious objective.” McCreary, 545 U.S. at 864, 125 S.Ct. 2722; see also Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (“When a governmental entity professes a secular purpose for an arguably religious policy, the government’s characterization is, of course, entitled to some deference. But it is nonetheless the duty of the courts to ‘distinguis[h] a sham secular purpose from a sincere one.’ ” (quoting Wallace, 472 U.S. at 75, 105 S.Ct. 2479 (O’Connor, J., concurring in the judgment))). The government cannot meet this requirement by identifying any secular purpose for the challenged action. McCreary, 545 U.S. at 865 n.13, 125 S.Ct. 2722 (noting that if any secular purpose sufficed, “it would leave the purpose test with no real bite, given the ease of finding some secular purpose for almost any government action”). Rather, the government must show that the challenged action’s primary purpose is secular. Edwards, 482 U.S. at 594, 107 S.Ct. 2573 (finding an Establishment Clause violation where the challenged act’s “primary purpose ... is to endorse a particular religious doctrine,” notwithstanding that the act’s stated purpose was secular).
When a court considers whether a challenged government action’s primary purpose is secular, it attempts to discern the “official objective ... from readily discoverable fact, without any judicial psychoanalysis of a drafter’s heart of hearts.” McCreary, 545 U.S. at 862, 125 S.Ct. 2722. The court acts as a reasonable, “objective observer,” taking into account “the traditional external signs that show up in the ‘text, legislative history, and implementation of the statute,’ or comparable official act.” Id. (quoting Santa Fe, 530 U.S. at 308, 120 S.Ct. 2266). It also considers the action’s “historical context” and “the specific sequence of events leading to [its] passage.” Edwards, 482 U.S. at 595, 107 S.Ct. 2573. And as a reasonable observer, a court has a “reasonable memor[y],” and it cannot “ ‘turn a blind eye to the context in which [the action] arose.’ ” McCreary, 545 U.S. at 866, 125 S.Ct. 2722 (quoting Santa Fe, 530 U.S. at 315, 120 S.Ct. 2266).
*594 The evidence in the record, viewed from the standpoint of the reasonable observer, creates a compelling case that EO-2’s primary purpose is religious. Then-candidate Trump’s campaign statements reveal that on numerous occasions, he expressed anti-Muslim sentiment, as well as his intent, if elected, to ban Muslims from the United States. For instance, on December 7, 2015, Trump posted on his campaign website a “Statement on Preventing Muslim Immigration,” in which he “eall[ed] for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on” and remarked, “[I]t is obvious to anybody that the hatred is beyond comprehension .... [O]ur country cannot be the victims of horrendous attacks by people that believe only in Jihad, and have no sense of reason or respect for human life.” J.A. 346. In a March 9, 2016 interview, Trump stated that “Islam hates us,” J.A. 516, and that “[w]e can’t allow people coming into this country who have this hatred,” J.A. 517. Less than two weeks later, in a March 22 interview, Trump again called for excluding Muslims, because “we’re having problems with the Muslims, and we’re having problems with Muslims coming into the country.” J.A. 522. And on December 21, 2016, when asked whether recent attacks in Europe affected his proposed Muslim ban, President-Elect Trump replied, “You know my plans. All along, I’ve proven to be right. 100% correct.” J.A. 506.
As a candidate, Trump also suggested that he would attempt to circumvent scrutiny of the Muslim ban by formulating it in terms of nationality, rather than religion. On July 17, 2016, in response to a tweet stating, “Calls to ban Muslims from entering the U.S. are offensive and unconstitutional,” Trump said, “So you call it territories. OK? We’re gonna do territories.” J.A. 798. One week later, Trump asserted that entry should be “immediately suspended[ed] ... from any nation that has been compromised by terrorism.” J.A. 480. When asked whether this meant he was “roll[ing ]back” his call for a Muslim ban, he said his plan was an “expansion” and explained that “[pjeople were so upset when I used the word Muslim,” so he was instead “talking territory instead of Muslim.” J.A. 481.
Significantly, the First Executive Order appeared to take this exact form, barring citizens of seven predominantly Muslim countries from entering the United States. And just before President Trump signed EO-1 on January 27, 2017, he stated, “This is the ‘Protection of the Nation from Foreign Terrorist Entry into the United States.’ We all know what that means.” J.A. 403. The next day, presidential advis- or and former New York City Mayor Giuliani appeared on Fox News and asserted that “when [Trump] first announced it, he said, ‘Muslim ban.’ He called me up. He said, ‘Put a commission together. Show me the right way to do it legally.’ ” J.A. 508.
Shortly after courts enjoined the First Executive Order, President Trump issued EO-2, which the President and members of his team characterized as being substantially similar to EO-1. EO-2 has the same name and basic structure as EO-1, but it does not include a preference for religious-minority refugees and excludes Iraq from its list of Designated Countries. EO-2, § 1(e). It also exempts certain categories of nationals from the Designated Countries and institutes a waiver process for qualifying individuals. EO-2, § 3(b), (c). Senior Policy Advisor Miller described the changes to EO-2 as “mostly minor technical differences,” and said that there would be “the same basic policy outcomes for the country.” J.A. 339. White House Press Secretary Spicer stated that “[t]he principles of the [second] executive order remain *595 the same.” J.A. 379. And President Trump, in a speech at a rally, described EO-2 as “a watered down version of the first order.” Appellees’ Br. 7 (citing Reilly, supra). These statements suggest that like EO-1, EO-2’s purpose is to effectuate the promised Muslim ban, and that its changes from EO-1 reflect an effort to help it survive judicial scrutiny, rather than to avoid targeting Muslims for exclusion from the United States.
These statements, taken together, provide direct, specific evidence of what motivated both EO-1 and EO-2: President Trump’s desire to exclude Muslims from the United States. The statements also reveal President Trump’s intended means of effectuating the ban: by targeting majority-Muslim nations instead of Muslims explicitly. And after courts enjoined EO-1, the statements show how President Trump attempted to preserve its core mission: by issuing EO-2—a “watered down” version with “the same basic policy outcomes.” J.A. 339. These statements are the exact type of “readily discoverable fact[s]” that we use in determining a government action’s primary purpose. McCreary, 545 U.S. at 862, 125 S.Ct. 2722. They are explicit statements of purpose and are attributable either to President Trump directly or to his advisors. We need not probe anyone’s heart of hearts to discover the purpose of EO-2, for President Trump and his aides have explained it on numerous occasions and in no uncertain terms. See Glassroth v. Moore, 335 F.3d 1282, 1296 (11th Cir. 2003) (“Besides, no psychoanalysis or dissection is required here, where there is abundant evidence,, including his own words, of the [government actor’s] purpose.”). EO-2 cannot be read in isolation from the statements of planning and purpose that accompanied it, particularly in light of the sheer number of statements, their nearly singular source, and the close connection they draw between the proposed Muslim ban and EO-2 itself.[16] See McCreary, 545 U.S. at 866, 125 S.Ct. 2722 (rejecting notion that court could consider only “the latest news about the last in a series of governmental actions, however close they may all be in time and subject”). The reasonable observer could easily connect these statements to EO-2 and understand that its primary purpose appears to be religious, rather than secular.
The Government argues, without meaningfully addressing Plaintiffs’ proffered evidence, that EO-2’s primary purpose is in fact secular because it is facially neutral and operates to address the risks of potential terrorism without targeting any particular religious group. Appellants’ Br. 42-44. That EO-2’s stated objective is religiously neutral is not dispositive; the entire premise of our review under Lemon is that even facially neutral government actions can violate the Establishment Clause. See Lemon, 403 U.S. at 612, 91 S.Ct. 2105 (recognizing that “a law ‘respecting’ ... the establishment of religion[] is not always easily identifiable as one,” and creating a three-part test for discerning when a facially neutral law violates the Establishment Clause); see also Santa Fe, 530 U.S. at 315, 120 S.Ct. 2266 (“Our examination [under Lemon's purpose prong] ... need not stop at an analysis of the text of the policy.”). We therefore reject the Government’s suggestion that EO-2’s facial neutrality might somehow fully answer the *596 question of EO-2’s primary purpose.[17]
The Government’s argument that EO-2’s primary purpose is related to nationai security, Appellants’ Br. 43-44, is belied by evidence in the record that President Trump issued the First Executive Order without consulting the relevant national security agencies, J.A. 397,- and that those agencies only offered a national security rationale after EO-1 was enjoined. Furthermore, internal reports from DHS contradict this national security rationale, with one report stating that “most foreign-born, US-based violent extremists likely radicalized several years after their entry to the United States, limiting the ability of screening and vetting officials to prevent their entry because of national security concerns.” J.A. 426. According to former National Security Officials, Section 2(c) serves “no legitimate national security purpose,” given that “not a single American has died in a terrorist attack on U.S. soil at the hands of citizens of these six nations in the last forty years” and that there is no evidence of any new security risks emanating from these countries. Corrected Brief for Former National Security Officials as Amici Curiae Supporting Appellees 5-8, ECF No. 126-1.[18] Like the district court, we think this strong evidence that any national security justification for EO-2 was secondary to its primary religious purpose and was offered as more of a “litigating position” than as the actual purpose of EO-2. See McCreary, 545 U.S. at 871, 125 S.Ct. 2722 (describing the government’s “new statements of purpose ... as a litigating position” where they were offered to explain the third iteration of a previously enjoined religious display). And EO-2’s text does little to bolster any national security rationale: the only examples it provides of immigrants born abroad and convicted of terrorism-related crimes in the United States include two Iraqis—Iraq is not a designated country in EO-2—and a Somalian refugee who entered the United States as a child and was radicalized here as an adult. EO-2, § 1(h). The Government’s asserted national security purpose is therefore no more convincing as applied to EO-2 than it was to EO-1.
Relatedly, the Government argues that EO-2’s operation “confirms its stated purpose.” Appellants’ Br. 43. “[I]t applies to six countries based on risk, not religion; *597 and in those six countries, the suspension applies irrespective of any alien’s religion.” Id. In support of its argument that EO-2 does not single out Muslims, the Government notes that these six countries are either places where ISIS has a heavy presence (Syria), state sponsors of terrorism (Iran, Sudan, and Syria), or safe havens for terrorists (Libya, Somalia, and Yemen). Appellants’ Br. 5-6. The Government also points out that the six Designated Countries represent only a small proportion of the world’s majority-Muslim nations, and EO-2 applies to everyone in those countries, even non-Muslims. Id. at 44. This shows, the Government argues, that EO-2’s primary purpose is secular. The trouble with this argument is that EO-2’s practical operation is not severable from the myriad statements explaining its operation as intended to bar Muslims from the United States. And that EO-2 is underinclusive by targeting only a small percentage of the world’s majority-Muslim nations and over-inclusive for targeting all citizens, even non-Muslims, in the Designated Countries, is not responsive to the purpose inquiry. This evidence might be relevant to our analysis under Lemon’s second prong, which asks whether a government act has the primary effect of endorsing or disapproving of religion, see Lynch v. Donnelly, 465 U.S. 668, 692, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O’Connor, J., concurring), but it does not answer whether the government acted with a primarily religious purpose to begin with. If we limited our purpose inquiry to review of the operation of a facially neutral order, we would be caught in an analytical loop, where the order would always survive scrutiny. It is for this precise reason that when we attempt to discern purpose, we look to more than just the challenged action itself. And here, when we consider the full context of EO-2, it is evident that it is likely motivated primarily by religion. We do not discount that there may be a national security concern motivating EO-2; we merely find it likely that any such purpose is secondary to EO-2’s religious purpose.
The Government separately contends that our purpose inquiry should not extend to “extrinsic evidence” that is beyond EO-2’s relevant context. Appellants’ Br. 45. The Government first argues that we should not look beyond EO-2’s “text and operation.” Id. at 45-46. But this is clearly incorrect, as the Supreme Court has explicitly stated that we review more than just the face of a challenged action. See, e.g., Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 699, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (“[O]ur [Establishment Clause] analysis does not end with the text of the statute at issue.”) (citing Church of the Lukumi Babalu Aye, 508 U.S. at 534, 113 S.Ct. 2217).[19]
*598 The Government next argues that even if we do look beyond EO-2 itself, under McCreary, we are limited to considering only “the operative terms of governmental action and official pronouncements,” Appellants’ Br. 46, which we understand to mean only EO-2 itself and a letter signed by the Attorney General and the Secretary of State that largely echoes EO-2’s text, id. at 8 n.3 (citing Letter, supra). We find no support for this view in McCreary. The McCreary Court considered “the traditional external signs that show up in the ‘text, legislative history, and implementation of the [challenged action],’ ” 545 U.S. at 862, 125 S.Ct. 2722 (quoting Santa Fe, 530 U.S. at 308, 120 S.Ct. 2266), but it did not limit other courts’ review to those particular terms. Id. Nor did it make such an artificial distinction between “official” and “unofficial” context. Rather, it relied on principles of “common sense” and the “reasonable observer[’]s ... reasonable memor[y]” to cull the relevant context surrounding the challenged action. Id. at 866, 125 S.Ct. 2722. The Government would have us abandon this approach in favor of an unworkable standard that is contrary to the well-established framework for considering the context of a challenged government action.
And finally, the Government argues that even if we could consider unofficial acts and statements, we should not rely on campaign statements. Appellants’ Br. 49. Those statements predate President Trump’s constitutionally significant “transition from private life to the Nation’s highest public office,” and as such, they are less probative than official statements, the Government contends. Id. at 51.[20] We recognize that in many cases, campaign statements may not reveal all that much about a government actor’s purpose. But we decline to impose a bright-line rule against considering campaign statements, because as with any evidence, we must *599 make an individualized determination as to a statement’s relevancy and probative value in light of all the circumstances. The campaign statements here are probative of purpose because they are closely related in time, attributable to the primary decision-maker, and specific and easily connected to the challenged action. See Glassroth, 335 F.3d at 1297 (reviewing an elected judge’s campaign materials that proclaimed him the “Ten Commandment’s Judge” as part of its inquiry into the constitutionality of a Ten Commandments display he installed); see also Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 463, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (considering facially neutral campaign statements related to bussing in an equal protection challenge); California v. United States, 438 U.S. 645, 663-64, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978) (referring to candidates’ political platforms when considering the Reclamation Act of 1902); Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266-68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (explaining that in the equal protection context, “[w]hen there is [] proof that a discriminatory purpose has been a motivating factor in the decision,” a court may consider “contemporary statements by members of the decisionmaking body”).
Just as the reasonable observer’s “world is not -made brand new every morning,” McCreary, 545 U.S. at 866, 125 S.Ct. 2722, nor are we able to awake without the vivid memory of these statements. We cannot shut our eyes to such evidence when it stares us in the face, for “there’s none so blind as they that won’t see.” Jonathan Swift, Polite Conversation 174 (Chiswick Press ed., 1892). If and when future courts are confronted with campaign or other statements proffered as evidence of governmental purpose, those courts must similarly determine, on a case-by-case basis, whether such statements are probative evidence of governmental purpose. Our holding today neither limits nor expands their review.[21]
The Government argues that reviewing campaign statements here would encourage scrutiny of all religious statements ever made by elected officials, even remarks from before they assumed office. Appellants’ Br. 49-50. But our review creates no such sweeping implications, because as the Supreme Court has counseled, our purpose analysis “demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.” Village of Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555; see also Lee v. Weisman, 505 U.S. 577, 597, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (“Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one.... ”). Just as a reasonable observer would not understand general statements of religious conviction to inform later government action, nor would we look to such statements as evidence of purpose. A person’s particular religious beliefs, her college essay on religious freedom, a speech she gave on the Free Exercise Clause—rarely, if ever, will such evidence reveal anything about that person’s actions once in office. For a past statement to be relevant to the government’s purpose, there must be a substantial, specific connection between it and the challenged government action. And here, in this highly unique set of circumstances, there is a direct link between the President’s numerous campaign statements *600 promising a Muslim ban that targets territories, the discrete action he took only one week into office executing that exact plan, and EO-2, the “watered down” version of that plan that “get[s] just about everything,” and “in some ways, more.” J.A. 370.
For similar reasons, we reject the Government’s argument that our review of these campaign statements will “inevitably ‘chill political debate during campaigns.’ ” Appellants’ Br. 50 (quoting Phelps v. Hamilton, 59 F.3d 1058, 1068 (10th Cir. 1995)). Not all—not even most—political debate will have any relevance to a challenged government action. Indeed, this case is unique not because we are considering campaign statements, but because we have such directly relevant and probative statements of government purpose at all. See Smith v. Town of Clarkton, 682 F.2d 1055, 1064 (4th Cir. 1982) (observing that government actors “seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate”). To the extent that our review chills campaign promises to condemn and exclude entire religious groups, we think that a welcome restraint.
Lastly, the Government contends that we are ill-equipped to “attempt! ] to assess what campaign statements reveal about the motivation for later action.” Appellants’ Br. 50. The Government argues that to do so would “mire [us] in a swamp of unworkable litigation,” id. (quoting Amended Order, Washington v. Trump, No. 17-35105, op. at 572 (9th Cir. Mar. 17, 2017) (Kozinski, J., dissenting from denial of reconsideration en banc)), and “forc[e us] to wrestle with intractable questions,” such as “the level of generality at which a statement must be made, by whom, and how long after its utterance the statement remains probative.” Id. But discerning the motives behind a challenged government action is a well-established part of our purpose inquiry. McCreary, 545 U.S. at 861, 125 S.Ct. 2722 (“Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country, and governmental purpose is a key element of a good deal of constitutional doctrine.” (citations omitted)). As part of this inquiry, courts regularly evaluate decisionmakers’ statements that show their purpose for acting. See, e.g., Green v. Haskell Cty. Bd. of Comm’rs, 568 F.3d 784, 801 (10th Cir. 2009) (considering news reports quoting county commissioners who described both their determination to keep challenged religious display at issue and the strength of their religious beliefs); Glassroth, 335 F.3d at 1297 (reviewing elected judge’s campaign materials for evidence of his purpose in installing religious display); Brown v. Gilmore, 258 F.3d 265, 277 (4th Cir. 2001) (reviewing state legislators’ statements in discerning purpose of statute challenged under the Establishment Clause); see also Edwards, 482 U.S. at 586-87, 107 S.Ct. 2573 (looking to statute’s text together with its sponsor’s public comments to discern its purpose). And the purpose inquiry is not limited to Establishment Clause challenges; we conduct this analysis in a variety of contexts. See, e.g., United States v. Windsor, — U.S. —, 133 S.Ct. 2675, 2693, 186 L.Ed.2d 808 (2013) (striking down federal statute based in part on “strong evidence” that “the congressional purpose [was] to influence or interfere with state sovereign choices about who may be married”); Pers. Adm’r of Mass. v. Feeney, 442 U.S. 256, 279-80, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (upholding public hiring preferences based in part on finding that government had not created preferences with purpose of discriminating on the basis of sex); N.C. State Conference of NAACP v. McCrory, 831 F.3d 204, 219 (4th Cir. 2016), cert. denied sub nom. *601 North Carolina v. N.C. State Conference of NAACP, — U.S. —, 137 S.Ct. 1399, 198 L.Ed.2d 220 (2017) (concluding that challenged voting restrictions were unconstitutional because they were motivated by racially discriminatory intent). We therefore see nothing “intractable” about evaluating a statement’s probative value based on the identity of the speaker and how specifically the statement relates to the challenged government action, for this is surely a routine part of constitutional analysis. And this analysis is even more straightforward here, because we are not attempting to discern motive from many legislators’ statements, as in Brown, but rather are looking primarily to one person’s statements to discern that person’s motive for taking a particular action once in office.
The Government has repeatedly asked this Court to ignore evidence, circumscribe our own review, and blindly defer to executive action, all in the name of the Constitution’s separation of powers. We decline to do so, not only because it is the particular province of the judicial branch to say what the law is, but also because we would do a disservice to our constitutional structure were we to let its mere invocation silence the call for meaningful judicial review. The deference we give the coordinate branches is surely powerful, but even it must yield in certain circumstances, lest we abdicate our own duties to uphold the Constitution.
EO-2 cannot be divorced from the cohesive narrative linking it to the animus that inspired it. In light of this, we find that the reasonable observer would likely conclude that EO-2’s primary purpose is to exclude persons from the United States on the basis of their religious beliefs. We therefore find that EO-2 likely fails Lemon’s purpose prong in violation of the Establishment Clause.[22] Accordingly, we hold that the district court did not err in concluding that Plaintiffs are likely to succeed on the merits of their Establishment Clause claim.
B.
Because we uphold the district court’s conclusion that Plaintiffs are likely to succeed on the merits of their Establishment Clause claim, we next consider whether Plaintiffs have demonstrated that they are likely to suffer irreparable harm in the absence of a preliminary injunction. Winter, 555 U.S. at 22, 129 S.Ct. 365; Musgrave, 553 F.3d at 298. As we have previously recognized, “in the context of an alleged violation of First Amendment rights, a plaintiff’s claimed irreparable harm is inseparably linked to the likelihood of success on the merits.” Centro Tepeyac v. Montgomery County, 722 F.3d 184, 190 (4th Cir. 2013) (en banc) (quoting Centro Tepeyac v. Montgomery County, 779 F.Supp.2d 456, 471 (D. Md. 2011)). *602 Accordingly, our finding that Plaintiffs are likely to succeed on the merits of their constitutional claim counsels in favor of finding that in .the absence of an injunction, they will suffer irreparable harm.
Indeed, the Supreme Court has stated in no uncertain terms that “loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.” Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); see also Johnson v. Bergland, 586 F.2d 993, 995 (4th Cir. 1978) (“Violations of first amendment rights constitute per se irreparable injury.”). Though the Elrod Court was addressing freedom of speech and association, our sister circuits have interpreted it to apply equally to Establishment Clause violations. See, e.g., Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 302 (D.C. Cir. 2006); Ingebretsen v. Jackson Pub. Sch. Dist., 88 F.3d 274, 280 (5th Cir. 1996); Parents’ Ass’n of P.S. 16 v. Quinones, 803 F.2d 1235, 1242 (2d Cir. 1986); ACLU of Ill. v. City of St. Charles, 794 F.2d 265, 274 (7th Cir. 1986). We agree with these courts that because of “the inchoate, one-way nature of Establishment Clause violations,” they create the same type of immediate, irreparable injury as do other types of First Amendment violations. Chaplaincy of Full Gospel Churches, 454 F.3d at 303; see also id. (“[W]hen an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place.... ”). We therefore find that Plaintiffs are likely to suffer irreparable harm if Section 2(c) of EO-2 takes effect.
C.
Even if Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction, we still must determine that the balance of the equities tips in their favor, “pay[ing] particular regard for the public consequences in employing the extraordinary remedy of injunction.” Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). This is because “courts of equity may go to greater lengths to give ‘relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.’ ” E. Tenn. Nat. Gas Co. v. Sage, 361 F.3d 808, 826 (4th Cir. 2004) (quoting Virginian Ry. Co. v. Sys. Fed’n No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937)). As the district court did, we consider the balance of the equities and the public interest factors together.
The Government first contends that “the injunction causes [it] direct, irreparable injury” that outweighs the irreparable harm to Plaintiffs because “ ‘no governmental interest is more compelling than the security of the Nation.’ ” Appellants’ Br. 54 (quoting Haig v. Agee, 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981)). When it comes to national security, the Government argues, the judicial branch “should not second-guess” the President’s “ ‘[p]redietive judgment[s].’ ” Appellants’ Br. 55 (quoting Dep’t of the Navy v. Egan, 484 U.S. 518, 529, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988)). The Government further argues that the injunction causes institutional injury, because according to two single-Justice opinions, “[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.” Maryland v. King, 567 U.S. 1301, 1303, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012) (Roberts, C.J., in chambers) (quoting New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977) (Rehnquist, J., in chambers)). The Government contends that this principle applies here because the *603 President “represents the people of all 50 states.” Appellants’ Reply Br. 25.
At the outset, we reject the notion that the President, because he or she represents the entire nation, suffers irreparable harm whenever an executive action is enjoined. This Court has held that the Government is “in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional.” Centro Tepeyac, 722 F.3d at 191 (quoting Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002)). “If anything,” we said, “the system is improved by such an injunction.” Id. (quoting Giovani Carandola, 303 F.3d at 521). Because Section 2(c) of EO-2 is likely unconstitutional, allowing it to take effect would therefore inflict the greater institutional injury. And we are not persuaded that the general deference we afford the political branches ought to nevertheless tip the equities in the Government’s favor, for even the President’s actions are not above judicial scrutiny, and especially not where those actions are likely unconstitutional. See Zadvydas, 533 U.S. at 695, 121 S.Ct. 2491; Chadha, 462 U.S. at 941-42, 103 S.Ct. 2764.
We are likewise unmoved by the Government’s rote invocation of harm to “national security interests” as the silver bullet that defeats all other asserted injuries. See United States v. Robel, 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (“Th[e] concept of ‘national defense’ cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. Implicit in the term ‘national defense’ is the notion of defending those values and ideals which set this Nation apart.... [O]ur country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties ... which makes the defense of the Nation worthwhile.”). National security may' be the most compelling of government interests, but this does not mean it will always tip the balance of the equities in favor of the government. See Holder v. Humanitarian Law Project, 561 U.S. 1, 34, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (agreeing with the dissent that the government’s “authority and expertise in [national security and foreign relations] matters do not automatically trump the Court’s own obligation to secure the protection that the Constitution grants to individuals” (quot-. ing id. at 61, 130 S.Ct. 2705 (Breyer, J., dissenting))). A claim of harm to national security must still outweigh the competing claim of injury. Here and elsewhere, the Government would have us end our inquiry without scrutinizing either Section 2(e)’s stated purpose or the Government’s asserted interests, but “unconditional deference to a government agent’s invocation of ‘emergency’ ... has a lamentable place in our history,” Patrolmen’s Benevolent Ass’n of New York v. City of New York, 310 F.3d 43, 53-54 (2d. Cir. 2002) (citing Korematsu v. United States, 323 U.S. 214, 223, 65 S.Ct. 193, 89 L.Ed. 194 (1944)), and is incompatible with our duty to evaluate the evidence before us.
As we previously determined, the Government’s asserted national security interest in enforcing Section 2(c) appears to be a post hoc, secondary justification for an executive action rooted in religious animus and intended to bar Muslims from this country. We remain unconvinced that Section 2(c) has more to do with national security than it does with effectuating the President’s promised Muslim ban. We do not discount that EO-2 may have some national security purpose, nor do we dis *604 claim that the injunction may have some impact on the Government. But our inquiry, whether for determining Section 2(e)’s primary purpose or for weighing the harm to' "the parties, is one of balance, and on balance, we cannot say that the Government’s asserted national security interest outweighs the competing harm to Plaintiffs of the likely Establishment Clause violation.
For similar reasons, we find that the public interest counsels in favor of upholding the preliminary injunction. As this and other courts have recognized, upholding the Constitution undeniably promotes the public interest. Giovani Carandola, 303 F.3d at 521 (“[U]pholding constitutional rights surely serves the public interest.”); see also Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (“[I]t is always in the public interest to prevent the violation of a party’s constitutional rights.” (quoting Sammartano v. First Jud. Dist. Ct., 303 F.3d 959, 974 (9th Cir. 2002))); Dayton Area Visually Impaired Pers., Inc. v. Fisher, 70 F.3d 1474, 1490 (6th Cir. 1995) (“[T]he public as a whole has a significant interest in ensuring ... protection of First Amendment liberties.”). These cases recognize that when we protect the constitutional rights of the few, it inures to the benefit of all. And even more so here, where the constitutional violation injures Plaintiffs and in the process permeates and ripples across entire religious groups, communities, and society at large.
When the government chooses sides on religious issues, the “inevitable result” is “hatred, disrespect and even contempt” towards those who fall on the wrong side of the line. Engel v. Vitale, 370 U.S. 421, 431, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Improper government involvement with religion “tends to destroy government and to degrade religion,” id., encourage persecution of religious minorities and nonbelievers, and foster hostility and division in our pluralistic society. The risk of these harms is particularly acute here, where from the highest elected office in the nation has come an Executive Order steeped in animus and directed at a single religious group. “The fullest realization of true religious liberty requires that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and non-religion, and that it work deterrence of no religious belief.” Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 305, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J. concurring). We therefore conclude that enjoining Section 2(c) promotes the public interest of the highest order. And because Plaintiffs have satisfied all the requirements for securing a preliminary injunction, we find that the district court did not abuse its discretion in enjoining Section 2(c) of EO-2.
V.
Lastly, having concluded that Plaintiffs are entitled to a preliminary injunction, we address the scope of that injunction. The Government first argues that the district court erred by enjoining Section 2(c) nationwide, and that any injunctive relief should be limited solely to Plaintiffs.
It is well-established that “district courts have broad discretion when fashioning injunctive relief.” Ostergren v. Cuccinelli, 615 F.3d 263, 288 (4th Cir. 2010). Nevertheless, “their powers are not boundless.” Id. The district court’s choice of relief “should be t carefully addressed to the circumstances of the case,” Va. Soc’y for Human Life, Inc. v. FEC, 263 F.3d 379, 393 (4th Cir. 2001), overruled on other grounds by Real Truth About Abortion, Inc. v. FEC, 681 F.3d 544 (4th Cir. 2012), *605 and “should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs,” Madsen v. Women’s Health Ctr., Inc., 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). Courts may issue nationwide injunctions consistent with these principles. See Richmond Tenants Org., Inc. v. Kemp, 956 F.2d 1300, 1308-09 (4th Cir. 1992).
The district court here found that a number of factors weighed in favor of a nationwide injunction, and we see no error. First, Plaintiffs are dispersed throughout the United States. See J.A. 263, 273; see also Richmond Tenants Org., 956 F.2d at 1308-09 (upholding nationwide injunction where challenged conduct caused irreparable harm in myriad jurisdictions across the country). Second, nationwide injunctions are especially appropriate in the immigration context, as Congress has made clear that “the immigration laws of the United States should be enforced vigorously and uniformly.” Texas v. United States, 809 F.3d 134, 187-88 (5th Cir. 2015), aff'd by an equally divided court, — U.S. —, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (quoting Immigration Reform and Control Act of 1996, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384); see also Arizona v. United States, 567 U.S. 387, 132 S.Ct. 2492, 2502, 183 L.Ed.2d 351 (2012) (describing the “comprehensive and unified system” of “tracking] aliens within the Nation’s borders”). And third, because Section 2(c) likely violates the Establishment Clause, enjoining it only as to Plaintiffs would not cure the constitutional deficiency, which would endure in all Section 2(c)’s applications. Its continued enforcement against similarly situated individuals would only serve to reinforce the “message” that Plaintiffs “are outsiders, not full members of the political community.” Santa Fe, 530 U.S. at 309, 120 S.Ct. 2266 (quoting Lynch, 465 U.S. at 688, 104 S.Ct. 1355 (O’Connor, J., concurring)). For these reasons, we find that the district court did not abuse its discretion in concluding that a nationwide injunction was “necessary to provide complete relief.” Madsen, 512 U.S. at 778, 114 S.Ct. 2516.
Finally, the Government argues that the district court erred by issuing the injunction against the President himself. Appellants’ Br. 55 (citing Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 501, 18 L.Ed. 437 (1866) .(finding that a court could not enjoin the President from carrying out an act of Congress)). We recognize that “in general, ‘this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties,’ ” Franklin v. Massachusetts, 505 U.S. 788, 802-03, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (opinion of O’Connor, J.) (quoting Johnson, 71 U.S. at 501), and that a “grant of injunctive relief against the President himself is extraordinary, and should ... raise[] judicial eyebrows,” id. at 802, 112 S.Ct. 2767. In light of the Supreme Court’s clear warning that such relief should be ordered only in the rarest of circumstances we find that the district court erred in issuing an injunction against the President himself. We therefore lift the injunction as to the President only. The court’s preliminary injunction shall otherwise remain fully intact.
To be clear, our conclusion does not “in any way suggest[ ] that Presidential action is unreviewable. Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President’s directive.” Franklin, 505 U.S. at 828, 112 S.Ct. 2767 (Scalia, J., concurring in part and concurring in the judgment). Even though the President is not “directly bound” by the injunction, we “assume it is substantially likely that the President ... *606 would abide by an authoritative interpretation” of Section 2(c) of the Second Executive Order. Id. at 803, 112 S.Ct. 2767 (opinion of O’Connor, J.).
VI.
For all of these reasons, we affirm in part and vacate in part the preliminary injunction awarded by the district court. We also deny as moot Defendants’ motion for a stay pending appeal.

AFFIRMED IN PART, VACATED IN PART

. Judges Motz, King, Wynn, Diaz, Floyd, and Harris join this opinion in full, Judge Traxler concurs in the judgment, and Judges Keenan and Thacker concur in substantial part and concur in the judgment.

. According to the Pew Research Center, Iraq's population is 99% Muslim, Iran's is 99.5%, Libya's is 96.6%, Sudan’s is 90.7%, Somalia’s is 99.8%, Syria’s is 92.8%, and Yemen's is 99.1%. See Pew Res. Ctr., The Global Religious Landscape 45-50 (2012).

. Section 2(c) reads in full:
To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. § 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that 'the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.

. As the Government notes, nationals from these six countries are ineligible for the Visa *574 Waiver Program, which currently allows nationals of thirty-eight countries seeking temporary admission to the United States for tourism or certain business purposes to enter without a visa. See 8 U.S.C. § 1187(a). The program excludes nationals of or aliens who have recently visited Iraq or Syria and nationals of or recent visitors to countries designated as state sponsors of terror (Iran, Sudan, and Syria). See 8 U.S.C. § 1187(a)(12); see U.S. Dep’t of State, U.S. Visa Waiver Program (Apr. 6, 2016), https://www.dhs.gov/visa-waiver-program (saved as ECF opinion attachment). It also excludes recent visitors to Libya, Somalia, and Yemen. U.S. Dep't of Homeland Security, DHS Announces Further Travel Restrictions for the Visa Waiver Program (Feb. 18, 2016), https://www.dhs.gov/ news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program (saved as ECF opinion attachment). Thus, nationals from the six countries identified in Section 2(c), like nationals from the vast majority of countries, must undergo the individualized vetting of the regular visa process.

. Trump’s "Statement on Preventing Muslim Immigration” reads in full:
(New York, NY) December 7th, 2015,— Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country’s representatives can figure out what is going on. According to Pew Research, among others, there is great hatred towards Americans by large segments of the Muslim population. Most recently, a poll from the Center for Security Policy released data showing "25% of those polled agreed that violence against Americans here in the United States is justified as a part of the global jihad” and 51% of those polled "agreed that Muslims in America should have the choice of being governed according to Shariah.” Shariah authorizes such atrocities as murder against nonbelievers who won’t convert, be-headings and more unthinkable acts that pose great harm to Americans, especially women.
Mr. Trump stated, "Without looking at the various polling data, it is obvious to anybody the hatred is beyond comprehension. Where this hatred comes from and why we will have to determine. Until we are able to determine and understand this problem and the dangerous threat it poses, our country cannot be the victims of the horrendous attacks by people that believe only in Jihad, and have no sense of reason or respect of human life. If I win the election for President, we are going to Make America Great Again.—Donald J. Trump
J.A. 346. The district court noted that, as of February 12, 2017, this statement remained on Trump’s campaign website. Int’l Refugee Assistance Project v. Trump, No. TDC-17-0361, — F.Supp.3d-,-, 2017 WL 1018235, at *4 (D. Md. Mar. 16, 2017). The statement was subsequently removed from the campaign website shortly before the May 8, 2017 oral argument in this case.

. Section 1182(f), entitled "Suspension of entry or imposition of restrictions by President,” provides in pertinent part that
[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.
8 U.S.C. § 1182(f).

. Section 1185(a)(1) provides that "[u]nless otherwise ordered by the President, it shall be unlawful [] for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe....” 8 U.S.C. § 1185(a)(1).

. Section 1152(a)(1)(A) provides, with certain exceptions not relevant here, that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.” 8 U.S.C. § 1152(a)(1)(A).

. The Government would have us, in assessing standing, delve into whether EO-2 sends a sufficiently religious message such that it violates the Establishment Clause. But this "put[s] the merits cart before the standing horse.” Cooksey, 721 F.3d at 239 (quoting Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1093 (10th Cir. 2006)). The question of whether EO-2 "conveys a message of endorsement or disapproval [of religion]” is a merits determination. Mellen v. Bunting, 327 F.3d 355, 374 (4th Cir. 2003) (quoting Wallace v. Jaffree, 472 U.S. 38, 56 n.42, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)). And both parties address it as a merits question in their briefs. Appellants' Br. 48 ("The Order, in contrast, *585 conveys no religious message...."); id. at 52 ("Here, the Order does not convey a religious message....”); Appellees’ Br. 38 ("The Order’s purpose to exclude Muslims conveys the exact same message....”). Because we assume the merits of Plaintiffs’ claim in assessing standing, we need not reach the Government’s argument on this point.

. Plaintiffs’ injuries are also consistent with the injuries that other courts have recognized in Establishment Clause cases that do not involve religious displays or prayer. See Awad v. Ziriax, 670 F.3d 1111, 1122 (10th Cir. 2012) (recognizing injury stemming from amendment that "condemned] [plaintiff's] religious faith and expose[d] him to disfavored treatment”); Catholic League for Religious & Civil Rights v. City & County of San Francisco, 624 F.3d 1043, 1052 (9th Cir. 2010) (en banc) (finding "exclusion or denigration on a religious basis within the political community” to be sufficiently concrete injury).

. For similar reasons, this case is not, as the Government claims, comparable to In re Navy Chaplaincy, 534 F.3d 756 (D.C. Cir. 2008). In that case, the court found that non-liturgical *586 Protestant chaplains who were part of the Navy’s Chaplain Corps lacked standing to bring a claim that the Navy preferred Catholic chaplains in violation of the Establishment Clause. Id. at 765. The court stated its holding as follows: "When plaintiffs are not themselves affected by a government action except through their abstract offense at the message allegedly conveyed by that action, they have not shown an injuiy-in-fact to bring an Establishment Clause claim.” Id. at 764-65. The court repeatedly emphasized that plaintiffs were not themselves affected by the challenged action. See id. at 758 ("[T]he plaintiffs do not claim that the Navy actually discriminated against any of them.”); id. at 760 ("But plaintiffs have conceded that they themselves did not suffer employment discrimination.... Rather, they suggest that other chaplains suffered discrimination.”). In fact, plaintiffs’ theory of standing was so expansive that their counsel conceded at oral argument that even the "judges on th[e] panel” would have standing to challenge the allegedly discriminatory conduct. Id. at 764. Here, by contrast, Doe #1 is directly affected by the government action'—both its message and its impact on his family. Thus, contrary to the Government's assertion, Appellants’ Br. 24, all Muslims in the United States do not have standing to bring this suit. Only those persons who suffer direct, cognizable injuries as a result of EO-2 have standing to challenge it.

. The district court here correctly recognized that the Supreme Court has on multiple occasions "reviewed the merits of cases brought by U.S. residents with a specific interest in the entry of a foreigner.” Int'l Refugee Assistance Project, — F.Supp.3d at —, 2017 WL 1018235, at *5 (citing Kerry v. Din, — U.S. —, 135 S.Ct. 2128, 2131, 2138-42, 192 L.Ed.2d 183 (2015) (reaching merits where American citizen challenged denial of husband’s visa application); Kleindienst v. Mandel, 408 U.S. 753, 756, 762-65, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (reaching merits where American scholars challenged denial of temporary nonimmigrant visa to Marxist Belgian journalist)); see also Mandel, 408 U.S. at 772, 92 S.Ct. 2576 ("Even assuming, arguen-do, that those on the outside seeking admission have no standing to complain, those who hope to benefit from the traveler’s lectures do.” (Douglas, J., dissenting)). The Supreme Court’s consideration of the merits in these cases suggests, at least at a general level, that Americans have a cognizable interest in the application of immigration laws to their foreign relatives.

. The Court specifically declined to decide "what First Amendment or other grounds may be available for attacking exercise of discretion for which no justification whatsoever is advanced.” Id.

. In Johnson, this Court considered an equal protection challenge to an immigration law. Id. at 126-27. Relying on several of our sister circuits, we equated Mandel's "facially legitimate and bona fide” test with rational basis review. Id. at 127 (citing Barthelemy v. Ashcroft, 329 F.3d 1062, 1065-66 (9th Cir. 2003), as amended (June 9, 2003); Wedderburn v. INS, 215 F.3d 795, 800 (7th Cir. 2000)). But the Johnson Court's interpretation is incomplete. Rational basis review does build in deference to the government’s reasons for acting, like Mandel's "facially legitimate” requirement, but it does not call for an inquiry into an actor’s "bad faith” and therefore does not properly account for Mandel’s "bona fide” requirement. Even more, Johnson and similar cases applying rational basis review did so in the context of equal protection challenges. See, e.g., Rajah v. Mukasey, 544 F.3d 427, 438 (2d Cir. 2008); Breyer v. Meissner, 214 F.3d 416, 422 n.6 (3d Cir. 2000). But courts do not apply rational basis review to Establishment Clause challenges, because that would mean dispensing with the purpose inquiry that is so central to Establishment Clause review. See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("In our Establishment Clause cases we have often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular *590 religion or of religion in general.”); see also Colorado Christian Univ. v. Weaver, 534 F.3d 1245, 1255 n.2 (10th Cir. 2008) (suggesting that rational basis review cannot be used to evaluate an Establishment Clause claim) (citing Heller, 554 U.S. 570, 128 S.Ct. 2783). We therefore decline to apply Johnson’s interpretation of Mandel's "facially legitimate and bona fide” test to this case.

. The Ninth Circuit has found that Justice Kennedy's concurrence is the controlling opinion in Din. It relied on the Supreme Court’s holding in Marks v. United States, which stated that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.” Cardenas, 826 F.3d at 1171 (quoting Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)). We agree that Justice Kennedy’s opinion sets forth the narrowest grounds for the Court's holding in Din and likewise recognize it as the controlling opinion.

. We reject the government’s contentions that none of these statements "in substance corresponds to [Section 2(c) ],” Appellants’ Br. 52, and that Section 2(c) "bears no resemblance to a 'Muslim ban,’ ” id. at 53. These statements show that President Trump intended to effectuate his proposed Muslim ban by targeting predominantly Muslim nations, rather than Muslims explicitly. Section 2(c) does precisely that.

. Plaintiffs suggest that EO-2 is not facially neutral, because by directing the Secretary of Homeland Security to collect data on "honor killings” committed in the United States by foreign nationals, EO-2 incorporates "a stereotype about Muslims that the President had invoked in the months preceding the Order.” Appellees' Br. 5, 7; see J.A. 598 (reproducing Trump’s remarks in a September 2016 speech in Arizona in which he stated that applicants from countries like Iraq and Afghanistan would be "asked their views about honor killings,” because “a majority of residents [in those countries] say that the barbaric practice of honor killings against women are often or sometimes justified”). Numerous amici explain that invoking the specter of "honor killings” is a well-worn tactic for stigmatizing and demeaning Islam and painting the religion, and its men, as violent and barbaric. See, e.g., Brief for New York University as Amicus Curiae Supporting Appellees 21, ECF No. 82-1; Brief for Muslim Justice League, et al., as Amici Curiae Supporting Appellees 17-18, ECF No. 152-1; Brief for History Professors and Scholars as Amici Curiae Supporting Appellees 2-3, ECF No. 154-1; Brief for Constitutional Law Scholars as Amici Curiae Supporting Appellees 19 n.3, ECF No. 173-1; Brief for Members of the Clergy, et al., as Amici Curiae Supporting Appellees 13, ECF No. 179-1. The Amici Constitutional Law Scholars go so far as to call the reference to honor killings "anti-Islamic dog-whistling.” Brief for Constitutional Law Scholars 19 n.3. We find this text in EO-2 to be yet another marker that its national security purpose is secondary to its religious purpose.

. A number of amici were current on the relevant intelligence as of January 20, 2017. Id. at 9.

. The Government separately suggests that we should limit our review to EO-2’s text and operation based on "the Constitution’s structure and its separation of powers," and the " ‘presumption of regularity' that attaches to all federal officials’ actions.” Appellants’ Br. 45 (quoting United States v. Chem. Found., Inc., 272 U.S. 1, 14, 47 S.Ct. 1, 71 L.Ed. 131 (1926)). In support of this point, the Government relies on pre-McCreary cases discussing, variously, judicial deference to an executive official's decision to deport an alien who had violated the terms of his admission to the United States, Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 491, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), the President’s absolute immunity from damages liability based on his or her official acts, Nixon v. Fitzgerald, 457 U.S. 731, 749, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), and the presumptive privilege we afford a President’s conversations and correspondence, United States v. Nixon, 418 U.S. 683, 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). These cases suggest that in certain circumstances, we insulate the President and other executive officials from judicial scrutiny in order to protect and promote the effective functioning of the executive *598 branch. But these cases do not circumscribe our review of Establishment Clause challenges or hold that when a President’s official acts violate the Constitution, the acts themselves are immune from judicial review. We find no support in this line of cases for the Government’s argument that our review of EO-2’s context is so limited. In fact, the Supreme Court has suggested quite the opposite. See Zadvydas, 533 U.S. at 695, 121 S.Ct. 2491 ("Executive and Legislative Branch decision-making ... power is subject to important constitutional limitations.” (citing Chadha, 462 U.S. at 941-42, 103 S.Ct. 2764)).

. The government also suggests that we can never rely on private communications to impute an improper purpose to a government actor. See, e.g., Modrovich v. Allegheny County, 385 F.3d 397, 411-12 (3d Cir. 2004) (limiting its review to statements made by the elected officials who oversaw the government action). But this is incorrect. These cases merely establish that the motives of people not involved in the decisionmaking process cannot alone evince the government’s motive. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.” (emphasis added)). But when those statements reveal something about the government’s purpose, they are certainly part of the evidence we review for purpose. In McCreary, the Court noted that a pastor had delivered a religious message at the ceremony for the challenged religious display. 545 U.S. at 869, 125 S.Ct. 2722. Based on this and other evidence of purpose, the Court concluded that “[t]he reasonable observer could only think that the [government] meant to emphasize and celebrate the [display’s] religious message.” Id. In any event, none of these cases contemplate the situation here, where the private speaker and the government actor are one and the same. We need not impute anyone's purpose to anyone else, for the same person has espoused these intentions all along. The distinction between candidate and elected official is thus an artificial one where the inquiry is only whether the reasonable observer would understand the candidate's statements to explain the purpose of his actions once elected.

. This finding comports with the McCreary Court's observation that "past actions [do not] forever taint” a government action, 545 U.S. at 873-74, 125 S.Ct. 2722. Whether a statement continues to taint a government action is a fact-specific inquiry for the court evaluating the statement.

. What is more, we think EO-2 would likely fail any purpose test, for whether religious animus motivates a government action is a fundamental part of our Establishment Clause inquiry no matter the degree of scrutiny that applies. See, e.g., Town of Greece v. Galloway, — U.S. —, 134 S.Ct. 1811, 1826, 188 L.Ed.2d 835 (2014) (upholding town's legislative prayer policy in part because "[i]n no instance did town leaders signal disfavor toward nonparticipants or suggest that their stature in the community was in any way diminished”); Hernandez v. Comm’r of Internal Revenue, 490 U.S. 680, 696, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (finding that the challenged statute satisfied Lemon’s purpose prong in part because "there is no allegation that [it] was born of animus”); Lynch, 465 U.S. at 673, 104 S.Ct. 1355 (stating that the Establishment Clause "forbids hostility toward any [religion]”); see also Brief for Constitutional Law Scholars 6-11. There is simply too much evidence that EO-2 was motivated by religious animus for it to survive any measure of constitutional review.